JOSEPH GREENBERG, Respondent-Appellant, v CBS INC., et al., Appellants-Respondents.

Second Department, August 6, 1979

694

696

APPEARANCES OF COUNSEL

*Coudert Brothers (John M. Keene, III, Carleton G. Eldridge, Jr., Eugene L. Girden* and *Ronald E. Guttman* of counsel), for appellants-respondents.

*Weinstein & Weinstein (Jonathan A. Weinstein* of counsel), for respondent-appellant.

## OPINION OF THE COURT

TITONE, J.

On November 7, 1976 the defendant-appellant CBS Inc. (CBS) telecast a show entitled "60 Minutes", which was estimated to have been viewed by 24 million people. A portion of the program dealing with amphetamine abuse, entitled "Over the Speed Limit", had been created and produced by defendant-appellant Grace Diekhaus. Defendant-appellant Mike Wallace served as the correspondent for this segment of the program. Purportedly, the program's primary purpose was to alert the public to the abuse and the potential for abuse of amphetamines and amphetamine substitutes in the treatment of obesity, or in the guise thereof.

During the pretaped telecast of the segment in question, an unidentified woman appearing in a shadow made allegedly defamatory statements concerning the plaintiff, Joseph Greenberg, M.D., in response to questions asked by Mike Wallace. Thereafter, Dr. Greenberg, an endocrinologist, initiated a libel action against CBS, Grace Diekhaus and Mike Wallace allegedly resulting from the telecast and from the dissemination of the film and its transcript. After completion of pretrial discovery proceedings, defendants moved for summary judgment and plaintiff cross-applied for the same relief. Special Term denied each application on the ground that issues of fact existed relative to the falsity of the statements and the degree of care exercised by the network and the individual defendants in confirming their accuracy. Following is the relevant portion of the colloquy between Wallace and the woman, subsequently identified as one Barbara Goldstein:

"WALLACE: You eventually came to Dr. Joseph Greenberg?

"WOMAN: Right, in Great Neck.

"WALLACE: And what did he do for you?

"WOMAN: I was taking eighty pills a day.

"WALLACE: Under his direction?

"WOMAN: Under his direction.

"WALLACE: Eighty pills?

"WOMAN: Eighty pills a day. 8-0.

"WALLACE: And how many of those were amphetamines or amphetamine related or amphetamine substitutes?

"WOMAN: I would say between four and six a day were amphetamine-type drugs. I had a very, very strange experience, and this is perhaps why I finally left him: I could not determine where I ended and where you began.

"WALLACE: What?

"WOMAN: I could not determine where I ended and where you began for two years after that time. I walked around holding my hands because I did not know that they were attached to my body.

"WALLACE: And when you said that to Dr. Greenberg, he said what to you?

"WOMAN: Nothing. He said everyone feels that way. * * *

"WOMAN: I had my daughter after ten years of marriage. She was born with some birth defects.

"WALLACE: Do you think as a result of amphetamines?

"WOMAN: Let me put it this way to you Mike, okay? We're real healthy people. My husband's family is real healthy people. My daughter comes along ten years after our marriage. She's got a kidney involvement. She's born with a— virtual nil antibody level. She has all kinds of allergies. For the first three years, we thought she was hyperactive. She looked like strung-out on—on medication. I feel that there has to be a connection between what I have done to my body, because of the medications that were given to me because I wanted to be thin."

At the outset, we take due cognizance that there is no privilege having a greater right to, or need for, protection, than that of freedom of the press. Throughout our history, publishers and broadcasters have rightly occupied a premier position in the unending struggle to maintain a free society. In recent years, all levels of the judiciary have endeavored to weigh the competing values and interests present in defamation suits against the media in order to insure that there be

no deterrent to the vigorous and fruitful exercise of First Amendment freedoms.

However, a judicial policy against inhibition is not equivalent to insurance against all risks. A policy of freedom without responsibility would inure to the detriment not only to society in general but also to the disseminators of news information themselves (see *Herbert v Lando,* 441 US 153).

What is also at stake in the dissemination of information in the public domain is the reputation and privacy of the individual or individuals mentioned or discussed therein. "Hit and run" journalism is no more protected under the First Amendment, than speeding on a crowded sidewalk is permitted under a valid driver's license. As Mr. Justice STEWART has recognized, an individual's vested right to the protection and comfort of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty" *(Rosenblatt v Baer,* 383 US 75, 92, concurring opn). It might also be observed that biased and untrammeled sensationalism in the name of free speech and free press in disregard of the truth or without regard for the truth, is no virtue, while responsible and exhaustive investigative journalism in the quest for truth is no vice.

We also realize that motions for summary judgment in defamation actions are invaluable devices to insure the free and uninhibited debate of matters of public concern by obviating the necessity for protracted and expensive litigation where there are no factual issues *(Washington Post Co. v Keogh,* 365 F2d 965, 968, cert den 385 US 1011). However "solicitude for first amendment freedoms was not intended to abrogate the fundamental rules governing the administration of summary judgment" *Bandelin v Pietsch,* 98 Idaho 337, 341, cert den 434 US 891). If a material, triable issue of fact exists in a libel action, summary judgment must be denied *(Hutchinson v Proxmire,* 443 US —, n 9, decided June 26, 1979; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 384, cert den 434 US 969; *James v Gannett Co.,* 40 NY2d 415, 418; *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 200).

Having carefully scrutinized the contentions of the parties and the issues raised in the appendix and briefs on appeal, we conclude that Mr. Justice NIEHOFF properly resolved the competing interests present at this stage of the case by deny-

ing all applications for summary judgment. Therefore we affirm.

In arriving at our determination to affirm, we have employed a two-pronged analysis to ascertain if factual questions exist. First, the form, content, effect, and falsity of the allegedly defamatory statements were examined since the plaintiff bears the burden of showing that the statements are in fact libelous (see *Cox Broadcasting Corp. v Cohn,* 420 US 469, 490). Second, the First Amendment limitations on recovery were then applied; the burden of defeating the constitutionally mandated privileges raised by the defendants was also on the plaintiff (see *Rinaldi v Holt, Rinehart & Winston, supra,* p 380). In making such two-pronged analysis, the following issues were considered: (1) the libelous nature of the statements; (2) whether the status of Dr. Greenberg was that of a "limited issue" public figure; and (3) the telecasters' duty of care in assessing the accuracy of Barbara Goldstein's comments.

### THE LIBELOUS NATURE OF THE STATEMENTS

■■ An allegedly libelous statement must be understood in the context in which it is heard *(Balabanoff v Hearst Cons. Pub.,* 294 NY 351). The whole thrust of "Over the Speed Limit" was not only that the prescribing of amphetamine substitutes for obesity was bad medical practice, but that such practice was illegal and carried criminal sanctions that were difficult to enforce. Moreover, the defamatory nature of the statements was reinforced both by the context of the telecast and the setting in which the statements were made. Be that as it may, there can be no recovery unless the statements are false.

Defendants contend that the undocumented statements made by Barbara Goldstein, a former patient of the plaintiff, concerning the amount and nature of the medication prescribed for her by the plaintiff, are true. The plaintiff, however, has presented evidence which significantly challenges her veracity. Dr. Greenberg's records show, and Barbara Goldstein has admitted, that during the short period in which she was treated by the plaintiff, she was also being treated by at least four other physicians, one of whom treated her as an in-patient at Smithtown General Hospital. Greenberg's records also indicate that he never prescribed 80 pills per day

and that some of the medication which he has been accused of prescribing was actually prescribed by other doctors.

Plaintiff admits that he prescribed drugs called "Presate" and "Tenuate-Dospan"; the defendants argue that these are "amphetamine-type" drugs while plaintiff disputes this classification. It should be noted that the terms amphetamine substitutes or amphetamine-type or related drugs were not defined during the program. Both parties rely on the Physicians Desk Reference, 1978, which notes that these drugs are designated as sympathomimetic amines and are commonly known as anorectics or anorexigenics. It indicates that both drugs have some pharmacologic activity similar to amphetamines but does not specify whether these drugs are in fact "amphetamine-type" medications. In addition, the State Department of Health places "Tenuate-Dospan" and "Presate" in a less dangerous category than it places amphetamines. Thus it is clear that no determination concerning the essential truth of Barbara Goldstein's statements can be made merely on affidavits (see *Yarmove v Retail Credit Co.,* 18 AD2d 790).

Defendants also seek to excuse part of Barbara Goldstein's comments as opinions. They argue that her belief that there was a causal connection between the medication prescribed by the plaintiff and the birth defects of her daughter is constitutionally protected. Furthermore, on oral argument counsel for the defendants also suggested that Barbara Goldstein's conclusion as to the nature of the medication prescribed by the plaintiff was constitutionally protected as an opinion.

■ The law is settled that opinions are constitutionally protected *(Gertz v Robert Welch, Inc.,* 418 US 323, 339-340), provided the facts supporting the opinion are set forth as its bases *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380, *supra).* However, if the facts are false, the opinion is actionable *(Edwards v National Audubon Soc.,* 556 F2d 113, 121, cert den *sub nom. Edwards v New York Times Co.,* 434 US 1002; *Hotchner v Castillo-Puche,* 551 F2d 910, 913, cert den *sub nom. Hotchner v Doubleday & Co.,* 434 US 834). Here, the truth or falsity of the facts upon which Barbara Goldstein relied has not yet been determined. Thus, no conclusion can be reached concerning the constitutionally protected status of her statements at this time.

■ ■ Whether an allegedly defamatory statement constitutes fact or opinion is a question of law *(Letter Carriers v Austin,* 418 US 264, 283-284). "The distinction frequently is a

difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole" (Gregory v McDonnell Douglas Corp., 17 Cal 3d 596, 601). Barbara Goldstein's statement concerning "amphetamine-type" drugs is not a statement of opinion. Opinions which label people or things generally employ terms which are loose and figurative (Buckley v Littell, 539 F2d 882, 893, cert den 429 US 1062). The term "amphetamine-type" is a relatively precise designation which is subject to rigorous examination for its truth or falsity. Moreover, even if such a designation were to be considered opinion, constitutional protection is not warranted in the setting in which the opinion was broadcast. Conspicuously absent are the facts upon which the designation was based. Thus, it is not constitutionally protected (see Kapiloff v Dunn, 27 Md App 514, 545, cert den 426 US 907).

#### DR. GREENBERG AS A "LIMITED ISSUE" PUBLIC FIGURE

■ The second prong of the analysis involves the media's duty of care in assessing the accuracy of Barbara Goldstein's comments. In order to apply that standard to those accountable for this program it is first necessary to define Dr. Greenberg's status (see Gertz v Robert Welch, Inc., 418 US 323, 351, supra). Whether Dr. Greenberg is a "limited issue" public figure must be resolved as a question of law (see Wolston v Reader's Digest Assn., 578 F2d 427, 429, revd on other grounds 443 US —, decided June 26, 1979). Defendants made what might be considered a paradoxical argument on this question. First they assert that he "has thrust" himself into the forefront by his actions, and then they contend he avoided the limelight by refusing to be interviewed by Wallace.

With respect to defendants' assertion that Dr. Greenberg "thrust" himself into this public controversy "in order to influence the resolution of the issues involved", it is essential that one look into the nature and extent of his participation in the "particular controversy giving rise to the defamation" (see Gertz v Robert Welch, Inc., supra, pp 345, 352). According to defendants, plaintiff "thrust" himself into the controversy surrounding amphetamines and amphetamine substitutes by prescribing "amphetamine-type" drugs to Barbara Goldstein. However, the fact that Greenberg may have prescribed such medication for his patient is hardly sufficient evidence to

warrant his being classified as a "limited issue" public figure in this case. Goldstein's short period of treatment under Greenberg's care terminated more than 10 years prior to the telecast, a fact not made known to the audience of 24 million persons. This is significant because there is nothing in the record to suggest that the use of amphetamines or their substitutes to combat obesity was a source of public debate during the course of Goldstein's treatment.

It is the lack of controversy which defeats the argument made by the media defendants and not merely the passage of time (cf. *Meeropol v Nizer,* 560 F2d 1061, cert den 434 US 1013; *Wolston v Reader's Digest Assn., supra).* In the absence of an allegation that the plaintiff's actions have generated the dispute, a finding that a public controversy exists is a prerequisite to a finding that the plaintiff has voluntarily acted to induce a specific outcome (cf. *Wolston v Reader's Digest Assn., supra).*

Moreover, even if a continuing controversy had been shown, we question whether the extent of the doctor's participation would be adequate to permit a limited issue public figure designation. The impression concerning the scale of the problem projected in "Over the Speed Limit" was nationwide drug abuse, precipitated by doctors in the course of treating their patient's obesity or in the guise of such treatment. It is apparent from the program that Dr. Greenberg is not unique. Thus it is clear that the act of prescribing that which may lawfully be prescribed, without more, cannot be deemed significant participation in a nationwide controversy. His actions simply did not invite or attempt to attract public attention (see *Gertz v Robert Welch, Inc.,* 418 US 323, 345, *supra; James v Gannett Co.,* 40 NY2d 415, 422, *supra; Hutchinson v Proxmire,* 443 US —, *supra; Wolston v Reader's Digest Assn., supra).*

However, defendants further argue that Dr. Greenberg has sought the attention of the public in a more affirmative manner. They refer to approximately 50 articles which he has published in scientific books and journals since 1951, and assert that individuals whose publishing activities were far less extensive have had to bear the burden of being designated public figures. We believe that the focus of this argument is misplaced. It is not the extensiveness of the activities which is the critical factor; rather it is the breadth of the audience

coupled with the appeal of the topic, upon which emphasis should be placed (cf. *Atkins v Friedman,* 49 AD2d 852).

In this instance Greenberg has merely published scientific articles in medical journals intended for a scholarly audience and not for a mass market. None of the articles appear to involve the subject matter of this telecast. His research did not attract media attention, nor did he seek the attention of the media. Thus, he is not a "limited issue" public figure (see *Hutchinson v Proxmire, supra).*

■ The final contention of the defendants under this heading involves Greenberg's refusal to be interviewed by Wallace. After Barbara Goldstein's segment had been taped, Wallace called the plaintiff and asked to interview him for the program. He was asked to comment generally as a practitioner in the treatment of obesity, on the abuse of amphetamines and their substitutes, and was not confronted in any way with the charges of Barbara Goldstein. Although Greenberg refused to be interviewed, he did suggest that Wallace consult the American Bariatric Society. Thus defendants' contention that the plaintiff should not be permitted to avoid the status of a "limited issue" public figure by using an "ostrich" approach to the controversy is specious. The circumstances upon which this argument is based do not suggest that Dr. Greenberg is attempting to avoid his status as a public figure, but instead indicate that Wallace was attempting to foist such status upon Greenberg without apprising the latter of the full nature of the issue and the alleged part he played in it. "Clearly those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure" *(Hutchinson v Proxmire,* 443 US —, —, *supra).*

■■ Furthermore, even if Dr. Greenberg had consented to be interviewed, the interview would not necessarily insure public figure status (see *Time, Inc. v Firestone,* 424 US 448, 455, n 3; *Wehringer v Newman,* 60 AD2d 385, mot for lv to app den 44 NY2d 641). Absent clear evidence of general fame or notoriety in the community and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation *(Gertz v Robert Welch, Inc.,* 418 US 323, 345, 352, supra).*

■ We therefore conclude that plaintiff under these circumstances, did not attain the status of a "limited issue" public figure. Dr. Greenberg is a private figure.

### MEDIA'S DUTY OF CARE

■ ■ In *Gertz v Robert Welch, Inc. (supra)* the Supreme Court of the United States ruled that the States were free to define their own standards of liability for the actionable defamation of a private individual. The Court of Appeals in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199, *supra),* accepted the responsibility and declared: "We now hold that within the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery *he* must establish, by a preponderance of the evidence, that the publisher acted in a *grossly irresponsible manner* without due consideration for the standards of information gathering and dissemination ordinarily followed by reasonable parties." (Emphasis supplied.)

■ There is no doubt that both the topic of amphetamine abuse is "within the sphere of legitimate public concern" and Barbara Goldstein's personal experience was "reasonably related to matters warranting public exposition" *(Chapadeau v Utica Observer-Dispatch, supra; cf. Matus v Triangle Pubs. Co.,* 445 Pa 384, cert den 408 US 930).

Thus the application of the *Chapadeau* standard of information gathering and dissemination quoted above to the manner in which the defendants confirmed the accuracy of the charges against the plaintiff presents the major concentration of issues on this appeal. In order to characterize the defendants' approach to the problem, it is necessary to review their actions.

Apparently a Long Island community was chosen in which to investigate the subject. Defendant Diekhaus spoke to about 12 people concerning the abuse of amphetamines or their substitutes. Among that group were a community leader, former and present drug abusers and members of Overeaters Anonymous. She extended a promise of confidentiality to half of the people interviewed by her. Of the nonconfidential group, none had personal experience with Dr. Greenberg and only two mentioned his name in a list of diet doctors. Of the people to whom confidentiality was extended, all had personal

contact as patients. To protect the status of these sources, Diekhaus relied on the newsperson's privilege and refused to provide information concerning their identity, their treatment, the period of that treatment, or their comments regarding it. One of the confidential sources, Barbara Goldstein, agreed to waive the privilege of confidentiality which had been extended to her for the purposes of this litigation. She stated that Diekhaus had interviewed her on the telephone, and during the conversation asked her if she had taken diet pills. A taping was arranged based on her affirmative response.

The appendix on appeal indicates that at no time was Barbara Goldstein asked about her medical history, when her treatment ended, for a list of the medications prescribed by Greenberg or for copies of her prescriptions. Her first interview with Diekhaus consisted, in Goldstein's words, of "[j]ust having a lot of fun at 7 o'clock in the morning, laughing and talking about good days and that kind of thing." Diekhaus has asserted that she verified the accuracy of Barbara Goldstein's statements in the same manner that most people's statements are verified. "Unless it is a very specific incident, you would talk to a lot of people who have done similar types of things, and you try and get a feeling for who says what, and whether these things seem to check out." Diekhaus spoke only to her confidential sources about the plaintiff. She did not speak with other physicians or pharmacists in the area.

Mike Wallace spoke to Dr. Greenberg but did not inform him of the investigation of his practice by "60 Minutes" or of its findings. Dr. Greenberg refused to be interviewed on the abuse of amphetamines and their substitutes. One other former patient of Dr. Greenberg was used as source material, namely, one Merri Lieberthal, a unit production manager for "60 Minutes". In 1973, while she was a patient of Dr. Greenberg and also the secretary of Wallace, the latter, in an attempt to find a solution to a family problem concerning obesity, asked her about her treatment. Tenuate-Dospan was prescribed for Merri Lieberthal, but there is no evidence to indicate whether Mike Wallace was aware of this prescription. Moreover, Merri Lieberthal stated that she never mentioned her treatment after 1973 and did not participate in the preparation of "Over the Speed Limit". Furthermore, Wallace's conversation with Merri Lieberthal is not evidence of verification and has no connection to the broadcast. No other

steps were taken by the defendants to confirm the accuracy of Barbara Goldstein's charges except Wallace did ask her at the taping if her comments were accurate.[1]

On the basis of this evidence, defendants contend that it is clear the program was "compiled, edited and broadcast in a highly professional and fully responsible manner." To support such contention they rely on Wallace's "attempt" to interview Dr. Greenberg and Diekhaus' "verification" of Barbara Goldstein's comments by the privileged statements of other patients.

Clearly, Wallace's actions are not sufficient to support a finding that the defendants acted responsibly as a matter of law. An attempt by him to interview Greenberg as a practitioner in the treatment of obesity (on the abuse of amphetamines and their substitutes) cannot be equated to any confrontation to determine the accuracy of the charges.

As to Grace Diekhaus' verification of Goldstein's comments by other patients, such cannot be considered on appeal since the former has extended the privilege of confidentiality to her sources under the newspersons' privilege law (see Civil Rights Law, § 79-h). New York's "Shield Law" is one of the broadest in the country, protecting both identity and information and vesting the media with the option to disclose or to refuse to disclose. No divestiture procedure is included. The defendants have opted thereunder not to disclose their sources or their information, but merely to reveal that the sources were patients. Their refusal to disclose has deprived the plaintiff of access to valuable and material evidence on a critical element of the plaintiff's cause of action. In short, defendants rely on undisclosed sources and information for verification and offer this verification as "proof" of their

---

1. Although not determinative of this issue, it should be noted that the State Department of Health followed entirely different procedures in its investigation of the plaintiff which emanated from the remarks of Barbara Goldstein at the telecast. In seeking to ascertain whether plaintiff abused his amphetamine prescription privileges, departmental investigators interviewed pharmacists in the vicinity of the plaintiff's offices and found that no prescriptions of his for "amphetamine drugs" had been filled, although some for Tenuate-Dospan had been. One druggist stated that he had never heard complaints against Dr. Greenberg in the neighborhood "as is common with many physicians who abuse their controlled drug privileges." They interviewed the plaintiff at length and examined his copies of the New York State Official Triplicate prescription forms. They recommended that the investigation be closed.

responsibility. Thus they have put in issue the very privilege upon which they rely. They are using the ·"Shield Law" affirmatively as a sword to prevent challenge by the plaintiff.

Such exploitation of the statute vitiates the limited right to recovery that the plaintiff has as a private individual, and should not be permitted (see *Brogan v Passaic Daily News,* 22 NJ 139). This purpose was not intended by the Legislature nor is such a use mandated by the First Amendment (see *Carey v Hume,* 492 F2d 631, petition for cert dsmd 417 US 938; *Garland v Torre,* 259 F2d 545, cert den 358 US 910). "A construction of the statute permitting the deprivation of a party's right of cross-examination on vital issues of his cause of action could create constitutional difficulty or infirmity"[2] *(Grogan, supra,* p 154). We must construe the statute to insure that its enforcement is enclosed by constitutional parameters. The solution to the dilemma on appeal is readily apparent. No consideration will be given to the defense of verification based on confidential material. The resolution of the trial problem is more difficult.

"Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances" *(Herbert v Lando,* 441 US 153, 175, *supra).* However, requiring the defendants to reveal what they seek to protect in this case, would be unnecessarily damaging to the purposes of the statute. Nor do we deem their actions in asserting a defense of responsibility based on confidential sources and information a waiver, since the effect of a waiver would be unjustly harsh in view of the defendants' lack of awareness of the implications present in their assertion of a defense based on the confidentiality statute. Thus, the fair solution, one which does not attenuate the policy considerations of the statute, is to allow defendants to elect the future course of their defense. At trial, if the defendants opt to rely on their statutory privilege, they should be precluded from any use of those sources and information as proof of verification or evidence of responsibility. On the other hand, if they choose to fully disclose their investigation, no limitation of the defense will occur.

### CONCLUSION

One final contention of the defendants should also be dis-

---

2. We do not allude to the possible unconstitutionality of the statute as a violation of the doctrine of separation of powers (see *People v Monroe,* 82 Misc 2d 850; *Ammerman v Hubbard Broadcasting,* 89 NM 307, 91 NM 250, cert den 436 US 906).

cussed, namely the assertion that their motion should not be defeated in the absence of evidence showing that the "defendants failed to act in accordance with the standards for prepublication editorial procedures commonly followed by responsible journalists." Succinctly stated, the defendants would require affidavits from competent, independent expert journalists before making a determination that the plaintiff had carried his burden.

In *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, *supra),* the Court of Appeals fashioned a gross negligence standard to balance the need for free debate against the right of the individual to be secure in his reputation. Like the concept of malice, the *Chapadeau* standard is a legal measure, designed to be applied in a wide range of circumstances and evaluated by the reasonable individual. These standards are not professional journalistic principles.

Professional journalistic principles are well known and courts have frequently applied these principles in conjunction with the constitutionally mandated standard in order to establish the parameters of recoverable libel (see *Curtis Pub. Co. v Butts,* 388 US 130, 156-159, reh den 389 US 889). This facility on the part of the judiciary leads to the conclusion that the affidavits of experts are welcome but not required on a motion for summary judgment. Indeed, the submission of such affidavits might create more factual questions than they resolve (see Richardson, Evidence [10th ed], § 367).

Moreover, on the facts of this case, expert testimony was unnecessary. The elementary standards of basic news reporting are common knowledge. News articles and broadcasts must contain the answers to the essential inquiries of who, what, where, when, why and how. The obvious conclusion from the defendants' lack of knowledge concerning Barbara Goldstein's medical history, the medication which comprised the prescribed "eighty pills a day", or the year that her treatment terminated, is that many of the elementary questions were not asked. Not asking those questions insured the defendants against the possibility of doubt. Thus, if it is questionable as to whether the network has met the standards of basic reporting, it is certainly questionable as to whether they met the more rigorous standards of investigative reporting. At trial, these questions must be assessed in the context of the medium's limitations and the topic's continuing news-

worthiness. Pressures of time, staff and budget, self-created or otherwise, are some of the factors which must be considered.

In conclusion, it should be noted that investigative reporting is high-risk journalism. The degree of care which determines the amount of a risk in such a venture lies exclusively within the control of those conducting and monitoring the investigation. In this case the decisions of defendants in their endeavor must be evaluated at a trial.

HOPKINS, J. P., DAMIANI and MARTUSCELLO, JJ., concur.

Order of the Supreme Court, Nassau County, dated July 26, 1978, affirmed, without costs or disbursements.