**MED–SALES ASSOCIATES, INC., Plaintiff,**

v.

**LEBHAR–FRIEDMAN, INC., Defendant.**

No. 86 Civ. 1560 (RWS).

United States District Court, S.D. New York.

June 30, 1987.

---

**6.** This ruling does not preclude defendant from producing further evidence in support of this defense at trial.

Stroock & Stroock & Lavan, New York City (Curtis C. Mechling, Elizabeth A. Mullins, Ellyn C. Lambert, of counsel), for plaintiff.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City (Michael A. Bamberger, Shirley Adelson Siegel, Avrom E. Greenberg, of counsel), for defendant.

OPINION

SWEET, District Judge.

This motion arises out of plaintiff Med-Sales Associates ("Med-Sales") libel suit against defendant Lebhar-Friedman ("Lebhar"). Lebhar has moved pursuant to Fed. R.Civ.P. 56 for an order dismissing the complaint. For the reasons stated below, the motion is granted and the complaint dismissed.

*Facts*

The U.S. House of Representatives Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce (the "Subcommittee") held a public hearing on July 10, 1985 in Washington, D.C. on the subject of "Prescription Drug Diversion and Counterfeiting."

A preliminary report by the staff of the Subcommittee, entitled "Drug Diversion— Prescription Drug Diversion and The American Consumer: What You Think You See May Not Be What You Get," (the "Staff Report") was released to the public at the hearing. Pages 14 through 21 of the Staff Report are titled "The Operation of the Diversion Market." At the bottom of page 19 and continuing at the top of page 20, after describing on page 19 "a recent example ... found in a criminal prosecution of one Jack Randell, president and sole shareholder of Audit Data Inc., ... indicated as the prime mover of a scheme that defrauded pharmaceutical manufacturers of approximately $3,400,000," the report read:

One of the principal purchasers of the diverted goods was Med Sales, a Hollywood, Florida wholesaler. Med Sales was one of the wholesale pharmaceutical companies that were known to deal in diverted merchandise ...

Med-Sales is engaged in the business of wholesale distribution of pharmaceutical products. Immediately after this mention of Med-Sales, the Staff Report gives examples of how the counterfeit drug Ovulen 21 moved through the diversion market. Specific mention was made in the course of a page and a half of the following firms: American Medic Sales, Inc., Marchar Laboratories, Lantor Corporation, Interstate Drug Exchange, Interstate Cigar Corporation and Quality King Distributors.

The opening statement of the Chairman of the Subcommittee, Honorable John D. Dingell, which was read at the hearing on July 10, after alluding to release of the preliminary report and to the convening of further hearings, stated in part:

The subcommittee had hoped to take testimony from industry and Government personnel familiar with recent drug diversion cases, such as the introduction into the U.S. domestic market of counterfeit Ovulen–21 birth control pills. However, because this and other cases remain the subject of active criminal investigation, the subcommittee has deferred public exploration of these matters. We have been assured that several criminal cases will have been completed, or at least entered the public stage, by this fall.

At the time of the July 10, 1985 hearing, Lebhar-Friedman was the publisher of a biweekly newsletter called *Washington*

*Distribution Pipeline*, which was published pursuant to a joint venture agreement with Wordpower, Inc. and Kenneth Rankin, its president. Wordpower and Rankin were "exclusively and completely responsible for providing editorial and news copy" sufficient for a newsletter at least four pages in length and Lehbar was responsible for promotion, publication and distribution.

The July 15, 1985 issue of *Washington Distribution Pipeline*, Vol. 1 issue 21, carried the following item:

**CRIMINAL CHARGES AGAINST 'SEVERAL' OVULEN 21 Rx DRUG COUNTERFEITERS** and/or diverters will surface publicly this fall, House Energy and Commerce Committee Chairman John Dingell (D–Mich.) predicted at the kick-off of new hearings into last year's discovery of bogus *Searle* birth control pills in the nation's drug supply. Among the loose ends left dangling by Dingell: the identity of the Panamanian connection which produced the counterfeit oral contraceptives; and whether charges will be brought against U.S. drug wholesalers (*Interstate Cigar, Interstate Drug Exchange, Lantor, Quality King, Med-Sales, Marchar, American Medic Sales, etc.*) who served as middlemen for the phony Searle OCs.

> Subcommittee investigators, meanwhile, linked the Ovulen counterfeiting episode to the broader "problem" of Rx drug diversion. "The primary reason that counterfeits like Ovulen 21 could easily be introduced into the distribution system is the existence of what is referred to as the diversion market," they told Dingell. Because of diverters, "American consumers cannot purchase the products are safe and effective." But who's to blame for the diverters? Check out *WDP*'s related story on page 2.

The piece was written personally by Kenneth Rankin, who had attended the July 10 hearing and obtained a copy of the Staff Report released at that time. Rankin spoke with subcommittee staff members at the hearing before he wrote the article.

Neither he nor Lehbar called the Congressional staff, federal prosecutors or Med-Sales itself to verify the piece after it had been written. Rankin's article accurately reflected the Staff Report's list except for the erroneous inclusion of Med-Sales.

The July 29, 1985 issue of *Washington Distribution Pipeline*, Vol. 1 issue 22, carried the following correction:

**C-O-R-R-E-C-T-I-O-N: MED–SALES WAS NOT FINGERED AS A SOURCE OF COUNTERFEIT DRUGS** by investigators for Rep. John Dingell's (D–Mich) House subcommittee as suggested in *WDP*'s July 15 issue. The Hollywood, Fla. drug wholesaler was incorrectly included in the list of several Rx distributors identified in the subcommittee's report as alleged middlemen in the distribution of bogus Ovulen 21 oral contraceptives last year.

On July 30, 1985 defendant wrote to plaintiff it "deeply regretted" that Med-Sales was "incorrectly included" in the July 15 issue as an alleged middleman in the distribution of counterfeit Ovulen 21 tablets, and explained the confusion as a result of mention of Med-Sales in that section of the Subcommittee's Staff Report.

Rankin has been a news reporter for twenty years, and during that period has researched and written in excess of 4,000 news and feature articles on government activities for a variety of business publications. For at least the past fifteen years he has been a member in good standing of the U.S. Senate and House Periodical Press Galleries, and he continues to hold Congressional press credentials.

In addition to *Washington Pipeline*, Lehbar published a number of other periodicals, including *Inside Pharmacy* and *Drug Store News*. Med-Sales has submitted some twenty articles from these two publications on the subject of drug diversion. The vast majority of the articles report on Congressional hearings on drug diversion, state citations issued against pharmacists or wholesalers who participated in drug diversion, legislation against drug diversion, or statements by law enforcement officials regarding probes into drug diver-

sion. Med-Sales has not charged that there was an inaccuracy in these articles, and it is self-apparent that government action in this sphere would be of interest to the audience of *Inside Pharmacy* and *Drug Store News*. Med-Sales has also adduced evidence to the effect that advertising by prescription drug manufacturers—whom Med-Sales deems "the principal competitors of the secondary source suppliers"—accounts for somewhat less than 20% of advertising in *Drug Store News*. According to Med-Sales, this level of advertising plus the number of articles covering government action against drug diversion is sufficient for a factfinder to infer Lebhar's recklessness in publishing Rankin's article.

Finally, Med-Sales points to passages in Rankin's deposition testimony to establish his bias against Med-Sales. Rankin testified that at the time that he wrote his article, he believed Med-Sales to be a drug diverter. In addition, he testified as follows:

Q. At the time you wrote this article, Mr. Rankin, in your mind did you recognize that the existence of drug diversion in the American marketplace posed a problem to American consumers?

A. Well, as I said, yes. There are problems posed by both diverted pharmaceuticals and pharmaceuticals through legitimate channels and there are advantages to consumers as a result of diversion, including lower pharmaceutical prices. And there are disadvantages to the so-called legitimate distributions of the pharmaceuticals, including often far higher prices.

The following exchange took place also:

Q. At the time you wrote the article ... were you aware of allegations that organized crime was involved with some drug diverters?

A. I believe so. I believe that this information came from the same staff report, or these allegations came from the same staff report.

Q. And in your mind was organized crime involvement with drug diverters a good thing or a bad thing?

A. Well, are you saying there was organized crime involvement?

Q. *If there was,* was it good or was it bad? I'll withdraw the question.

A. I'd like to answer that one. I will go on record as saying an organized crime involvement with drug diverters, lawyers, or anything else is bad. (emphasis added)

Med-Sales is a corporation organized under the laws of the State of Florida with its principal place of business in Florida. Lebhar is alleged to be a corporation organized under the laws of a state other than Florida with its principal place of business in the Southern District of New York.

### Status of the Parties

Two of the legal issues raised by parties will not be decided, because assuming *arguendo* that Med-Sales prevails with respect to them, it has, nonetheless, still failed to create a triable issue of material fact. The first of these issues is whether Med-Sales is a private or a public (or limited purpose public) figure. For the purposes of this discussion it will be assumed that Med-Sales is a private figure.

Similarly, Med-Sales has argued that Lebhar is a joint venturer with Rankin, that, consequently, Lebhar was at fault as a publisher and is jointly and severally liable for any negligence on Rankin's part. For the purposes of this discussion, it will be assumed that Med-Sales is correct.

### Gross Negligence under New York Libel Law

Under New York law, to prevail on this libel action, Med-Sales would have to prove that Rankin was grossly negligent. Because Med-Sales has failed to raise a triable issue as to Rankin's gross negligence, Lebhar's application is granted and the complaint dismissed.

Every libel action arguably concerning matters of public concern is prosecuted in the shadow of the First Amendment. For instance, in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court ruled that in order to prevail in a libel action, a public official must show "actual malice" to pre-

vail as a plaintiff in a defamation action. Actual malice is knowledge of falsity or reckless disregard for the truth.

Just over a decade ago, the Supreme Court flirted with a constitutional rule that applied a *New York Times* actual malice test to defamatory falsehoods about *private* individuals as long as the statements concerned matters of general or public interest. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Reconsidering the issue a few years later in *Gertz v. Welch*, 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1973), the court decided that the *Rosenbloom* rule allowed states insufficient latitude in providing a remedy for the injury of the reputation of private individuals, and was a difficult standard for state and federal judges to apply. Consequently, the Court held: "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010. Exercising the latitude granted by the Supreme Court, the New York Court of Appeals set forth its rule for defamatory falsehood of private individuals in *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975). The *Chapadeau* Court held:

> [W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Id.*

In doing so, the New York Court of Appeals thus promulgated a common law rule that obviously evidenced a concern with many of the policies inherent in the Supreme Court's discussion of First Amendment limitations on private libel actions. Indeed, the Court of Appeals adopted a "public concern" subject-matter test for the common law very close to that enunciated in *Rosenbloom* and repudiated (as a Constitutional requirement) in *Welch.*

Under *Chapadeau,* that Congress was holding hearings on the issue of drug diversion and counterfeit pharmaceutical establishes without further inquiry that the matter at issue in the article was "arguably within the sphere of legitimate public concern," and "reasonably related to matters warranting public exposition." Thus the question remaining is whether Med-Sales has raised a sufficient issue of fact to show that the reporter or publisher acted in a "grossly irresponsible manner."

To act in a "grossly irresponsible manner" under *Chapadeau* is to act with more recklessness than the "ordinary negligence" standard of care. *See Simonsen v. Malone Evening Telegram*, 98 A.D.2d 905, 470 N.Y.S.2d 898, 900 (3d Dept.1983). One New York court has concluded that the *Chapadeau* test is simply "a gross negligence standard," *Greenberg v. CBS*, 69 A.D.2d 693, 419 N.Y.S.2d 988, 997 (2d Dept 1979), and in New York, "Gross negligence involves the thoughtless disregard of consequences without any attempt to avoid them," *Veals v. Consolidated Edison Co.*, 114 Misc.2d 626, 452 N.Y.S.2d 153, 155 (1982). In distinguishing between the concepts of negligence and gross negligence, the *Veals* court wrote:

> "Gross negligence" means that the defendant is so extremely careless that it is equivalent to recklessness, while ordinary negligence is the doing of some act which a reasonably prudent person would not do under the circumstances or a failure to use ordinary and reasonable care under the circumstances.

452 N.Y.S.2d at 155. Thus, as a matter of New York State libel law, for matters that concern the public interest, *Chapadeau* holds plaintiffs to a proof at least as stringent as that to which *New York Times*

constitutionally holds plaintiffs suing public figures.

The exact parameters of the *Chapadeau* concept of recklessness can be divined, of course, only by reference to New York cases applying the standard to specific facts. The case closest to the facts here is *Simonsen v. Malone Evening Telegram*, 98 A.D.2d 905, 470 N.Y.S.2d 898 (3d Div. 1983). In *Simonsen*, the trial court followed *Chapadeau* by dismissing the claims at the end of plaintiff's case after hearing testimony that a reporter was read a series of criminal docket entries by a police officer, and "formed the erroneous impression that they were somehow connected and wrote his story accordingly." 470 N.Y.S.2d at 899. As printed, the article said that the plaintiff had been arrested and charged in connection with the theft of three vehicles from an automobile dealer's premises, when in fact he had been arrested for a separate incident and charged merely with criminal mischief in the fourth degree, a misdemeanor.[1] The court wrote: "There was no evidence that the reporter grossly distorted what he heard from the docket, that he sprang to unwarranted conclusions, or that he had, or should have had, any reason to doubt the accuracy of the reporting policeman or the department in general." *Id.* In addition, although the managing editor had in fact verified some parts of the story with the police department (not the part in error), the court found that he had not been under a legal duty to do so, because he had no reason to doubt the reporter's story. *Id.; see also DeLuca v. New York News*, 109 Misc.2d 341, 438 N.Y.S.2d 199, 205 (Sup.Ct.1981) (publisher may rely on reporter of proven reliability and has no duty to research independently). The court concluded:

> All that was demonstrated here was error and a failure to check the written record. While such conduct might support a finding of ordinary negligence, it fails utterly to rise to a level which would sustain a finding by the trier of the facts that the publisher acted in a

grossly irresponsible manner and without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Id.* 470 N.Y.S.2d at 900. In *Simonsen*, the reporter heard something from a creditable source, misconstrued it, failed to double-check it, and printed the mistaken story. As a matter of law, the Appellate Division held that these facts were "utterly" insufficient to submit to a jury on the issue of whether the publisher "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." 379 N.Y. S.2d at 64.

In this case it is undisputed that Rankin, an experienced reporter, attended a Congressional hearing in order to file a story on the subject of the hearings, drug diversions and pharmaceutical counterfeits. The reporter heard the statement of the Chairman predicting that indictments would be brought against certain companies, spoke with committee staff, and then read through and underlined a staff report before writing his two-paragraph article. Rankin's article accurately reflected the companies listed in the Staff Report with a single exception: Rankin included Med-Sales, which had been discussed in the staff report as purchasing fraudulently obtained pharmaceutical rather than counterfeited ones.

■ Under New York law, "[A]ccepted standards of journalism require neither exhaustive research nor painstaking judgments. Newspapers, and reporters, have the right to be wrong so long as they are not guilty of not checking their facts at all, making gross distortions of the record or jumping to totally unwarranted conclusions." *DeLuca v. New York News*, 109 Misc.2d 341, 438 N.Y.S.2d 199, 205 (Sup.Ct. 1981). Here Rankin filed an article on what transpired at a Congressional hear-

---

1. *Simonsen* incorporated by reference the facts of an earlier decision in the case, published at

87 A.D.2d 710, 448 N.Y.S.2d 894 (3d Dept.1982).

ing, and put Med-Sale's name in the wrong list of companies. It is not a case where the reporter failed even to ask the most basic questions about the issue. *See Greenberg v. CBS*, 69 A.D.2d 693, 419 N.Y. S.2d 988, 998 (2d Dept 1979). It is not a situation in which the reporter acted in an obviously unprofessional way, as in *Greenberg*, where a reporter conducted a crucial interview by " '[j]ust having a lot of fun at 7 o'clock in the morning, laughing and talking about good days and that kind of thing." 419 N.Y.S.2d at 996.[2] Nor is it a case in which the inherent untrustworthiness of the article's source imposes an enhanced duty to corroborate. *See Pep v. Newsweek*, 553 F.Supp. 1000, (S.D.N.Y. 1983). Rankin filed a story on a hearing after attending the hearing, speaking with committee staff, and studying the staff report issues at the hearing. Unquestionably, he erred in adding Med-Sales to the otherwise accurate list, but, as a matter of New York law, as set forth in *Simonsen*, the facts adduced by Med-Sales cannot establish a *Chapadeau* "gross irresponsibility."

■ Med-Sales has also sought to show that Lebhar has a decided editorial slant against the secondary drug market and diverters, and that this editorial bias is sufficiently pronounced as to be probative on the issue of gross irresponsibility. According to Med-Sales, a triable issue is presented on the question because drug companies are regular advertisers in other Lebhar publications, and that other Lebhar publications (not Washington Pipeline) have carried articles with a slant against the secondary market. Even assuming that Lebhar had such an editorial bias, all publications have some sort of editorial slant, and, indeed, the variety of angles in the press is exactly what creates the spirited debate that is the aim of the First Amendment. In *Simonsen*, the paper could be presumed to have a general editorial bias against burglary and burglars, but such a slant did not raise an inference that the paper had been grossly irresponsible with respect to that particular defamed plaintiff. Here the existence of Lebhar's editorial viewpoint would be insufficient to establish gross irresponsibility on Lebhar's part when one of its reporters inserts a single wrong name into an otherwise accurate list of seven companies. Med-Sales has not claimed that this editorial viewpoint has resulted in even a single other inaccuracy in the stack of articles on the subject of drug diversion that Med-Sales has produced, they have not adequately explained how Lebhar's viewpoint might have corrupted Rankin into gross irresponsibility on the issue, and they have not shown any specific animus towards the only company mistakenly included in the list: Med-Sales.

Quite the contrary, after an opportunity to depose Rankin fully, Med-Sales points to only two statements that they say establish his bias. First, when asked whether he believed drug diversion posed a problem to consumers, Rankin replied that he did, but that he also recognized benefits such as lower prices to consumers. Second, when asked hypothetically if he thought that organized crime involvement in diversion would be bad *if it existed*, Rankin answered uncategorically that organized crime involvement in anything is bad. These two statements fail to establish an issue of fact as to Rankin's bias or gross irresponsibility that should be submitted to a jury, and Lebhar's reliance on them serves only to highlight the absence of support for their case.

Under state libel doctrine as enunciated in *Chapadeau* and *Simonsen*, New York does not, as a matter of law, permit an inference of "gross irresponsibility" to be drawn against either Lebhar or Rankin from the facts as set forth by Med-Sales. Given the stringent New York libel standards, the facts are "so one-sided that one

---

**2.** Yet another fact that distinguishes *Greenberg* from the case at hand is that *Greenberg* concerned investigative reporting, which the court said called for "more rigorous standards" of reporting because of its nature of "high-risk journalism." The two-paragraph article here, however, is the antithesis of investigative reporting. Rankin did no muckraking himself, but was performing the task of reporting what a Congressional committee had found and memorialized in a staff report.

party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

**Conclusion**

Under New York libel law, Med-Sales has failed to establish that a triable issue of fact exists with respect to Lebhar's alleged "gross irresponsibility." Consequently, Lebhar's motion is granted and the complaint dismissed.

IT IS SO ORDERED.