Paddy P. JAMERSON,
Plaintiff-Appellant,

v.

ANDERSON NEWSPAPERS, INC. and
Jeff Evans, Defendant-Appellees.

No. 1–1282A342.

Court of Appeals of Indiana,
First District.

Nov. 1, 1984.

**1244**

Richard E. Kreegar, Chesterfield, Ronald K. Fowler, Anderson, for plaintiff-appellant.

Robert P. Johnstone, Michael Rosiello, Barnes & Thornburg, Indianapolis, for defendants-appellees.

NEAL, Presiding Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant Paddy Jamerson (Jamerson) appeals the judgment of the Henry Circuit Court that he take nothing in his libel and slander and conspiracy to libel action against defendant-appellees Anderson Newspapers, Inc. and Jeff Evans, a reporter for the *Anderson Herald*.

We affirm.

## STATEMENT OF THE FACTS

Paddy Jamerson was formerly the Chief of Police of Anderson, Indiana from 1972–1979. During his tenure as Chief, the defendant newspapers, and Jeff Evans, a reporter for one of the papers, published a series of articles about the Anderson Police Force and Chief Jamerson which Jamerson considered to be defamatory. Jamerson alleged that the publication of the articles resulted in an investigation of his activities by the IRS as well as by a special Task Force established by a Madison County Grand Jury. Jamerson contends that the content of the articles and its repercussions ultimately forced him to leave his profession as a police officer.

Jamerson filed suit against the newspapers and Evans for compensatory and punitive damages for libel and slander and conspiracy to libel on June 11, 1981. His amended complaint referred to various articles appearing in the newspapers over a period of nine years, alleged the injuries to the plaintiff resulting therefrom and prayed for $518,900.00 compensatory damages and punitive damages of $1,500,-000.00.

In July 1981, the plaintiff filed a motion to compel the newspapers and Evans to reveal their unnamed sources. Defendants

refused, setting forth the Indiana Shield Statute, IND.CODE 34-3-5-1, as a defense. The trial judge denied Jamerson's motion. Jamerson again attempted to force the newspapers and Evans to reveal their sources by filing a motion in limine just prior to trial; the motion requested that in light of the trial court's previous ruling on the motion to reveal sources, the court should find that defendants not be permitted to (a) introduce any evidence concerning the unnamed source; (b) in any way introduce evidence that said sources ever existed; or (c) introduce evidence that they relied on the sources in the publication of any of the complained of articles. The motion further asked that the trial court invoke a presumption that the defendants had no source or sources.

In order to mitigate the severity of the shield law, the trial court entered a pre-trial order on April 27, 1982 which required the newspapers and Evans to elect as to whether to maintain the newsman's privilege under the shield law or to forego the use of testimony during the trial relating to their sources and information obtained from the sources. Defendants elected to maintain the use of the shield law.[1]

The case was tried to the court without a jury and at the close of the plaintiff's evidence, the defendants filed a motion for involuntary dismissal pursuant to Ind. Rules of Procedure, Trial Rule 41(B). The trial court granted dismissal as to several of Jamerson's claims, holding that the plaintiff failed to meet his burden of proof as to the dismissed claims. At the close of all the evidence, defendants renewed their T.R. 41(B) motion as to the remainder of Jamerson's claims, and the trial court granted the motion. The trial court dismissed some of the claims because Jamerson failed in proving that the statements were published by the newspapers with knowledge of falsity or reckless disregard of whether the statements were false or not. *See N.Y. Times Co. v. Sullivan,*

(1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, *infra.* Some of the claims were dismissed because the trial court found they were opinions and therefore privileged; some claims were dismissed because Jamerson failed to prove that the statements concerned him personally. As to others, the trial court determined that Jamerson failed to prove that they were false.

In reviewing Jamerson's damage claims, the trial court decided that the plaintiff did not prove that the supposedly defamatory statements proximately caused his alleged special damages. The trial court concluded that even though, at most, the plaintiff would be entitled to recover nominal damages for injury to reputation, he still failed to establish liability on defendants' part and thus defendants were entitled to judgment on Jamerson's nominal damages claim. Further, the evidence at trial was insufficient to support an award of punitive damages against either defendant.

Judgment was entered that Jamerson take nothing in the action.

## ISSUES

On appeal, Jamerson raises seven issues, some of which we have attempted to restate and consolidate:

I. Did the trial court deny Jamerson a fair trial when it refused to compel defendants to produce their sources and refused to invoke a "no source" presumption?

II. Does the shield law grant the news media an absolute privilege not to reveal their sources?

III. Does the shield law violate article one, section 12 of the Indiana Constitution?

IV. Did the trial court apply an improper standard of proof to Jamerson's conspiracy claim?

---

1. The trial court's ruling which required the newspaper to elect as to whether to maintain its privilege under the shield law or to forego the use of testimony of protected sources is not

challenged here by Anderson Newspapers, and thus this opinion should not be construed as approving or disapproving the trial court's action in this regard.

V. Did the trial court err in determining that opinions are constitutionally protected?

## I. *Fair Trial.*

■ The trial court did not err in denying Jamerson's motion to compel sources. Jamerson's entire basis for his allegation of an unfair trial consists of criticism of the current state of libel law; that is, the heavy burden of proof imposed on a plaintiff established by *N.Y. Times v. Sullivan,* (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. Since *N.Y. Times,* the plaintiff has the burden of showing that a statement was made with "actual malice", "with knowledge that it was false or with reckless disregard of whether it was false or not". *N.Y. Times, supra,* at 279, 84 S.Ct. at 726. A subsequent decision refined the definition of actual malice, *St. Amant v. Thompson,* (1968) 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, distinguished between public officials and private citizens in terms of protection allowed, *Time, Inc. v. Firestone,* (1976) 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154, and determined that redress for injury to reputation is not a right protected by the U.S. Constitution, *Paul v. Davis,* (1976) 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405.

Jamerson asserts that since the *N.Y. Times* decision was handed down, there has been a number of evidentiary problems, and recent decisions have attempted to strike a balance between the public official's right to maintain an action and the media's right to a free press. He correctly cites *Herbert v. Lando,* (1979) 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 and *Branzburg v. Hayes,* (1972) 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 as Supreme Court decisions which struck a balance between the competing interests and determined that the First Amendment mandates a "qualified privilege" for newspeople. In the latter decision, for the first time, the Supreme Court considered the question of whether the First Amendment affords a constitutional testimonial privilege to a newsman so that he is not required to respond to a grand jury subpoena. *Branzburg, supra.* The Supreme Court refused to grant such a privilege; however, Jamerson neglects to state that the *Branzburg* decision specifically left state legislatures free to create their own newsman's privilege, whether qualified or absolute:

> "There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to require a newsman's privilege, either qualified or absolute."

*Branzburg, supra,* at 706, 92 S.Ct. at 2669.

Similarly, in *Herbert v. Lando, supra,* the Supreme Court had the opportunity to fashion an absolute privilege under the First Amendment in a defamation case and again declined to do so. The court used a balancing approach in determining that the journalists did not have an absolute constitutional privilege not to answer. *Id.* 441 U.S. at 169, 99 S.Ct. at 1645.

■ IND.CODE 34–3–5–1, our shield law, confers, without a doubt, an absolute privilege on the news media. ("Any person ... connected with a newspaper ... *shall not be compelled* to disclose in any legal proceeding or elsewhere the source of any information procured or obtained in the course of his employment ....") Jamerson himself concedes the shield law is absolute. No Indiana decisions have, as of yet, pared down this absolute privilege except to state that it is personal to the newsman. *See, e.g., Hestand v. State,* (1971) 257 Ind. 191, 273 N.E.2d 282.

■ Jamerson also alleges that the proper approach to the "problem" created by the absolute privilege, and the method which the trial court refused to adopt, is to impose a "no source" presumption on a defendant who elects to maintain the privilege.

The use of the "no source" presumption apparently first occurred in *Downing v. Monitor Publishing Co.*, (1980) 120 N.H. 383, 415 A.2d 683. *Downing* involved an interlocutory appeal from a trial court's granting of plaintiff's motion to compel discovery of defendant's unnamed sources and the defendant's subsequent refusal to disclose those sources.

Relying on the reasoning of *Herbert* and *Branzburg*, the Supreme Court of New Hampshire stated:

> "It is untenable to impose the heavy *New York Times* burden of proof upon a plaintiff and at the same time prevent him from obtaining the evidence necessary to meet that burden. We hold there is not an absolute privilege allowing the press to decline to reveal sources of information when those sources are essential to a libel plaintiff's case."

*Downing, supra,* 415 A.2d at 686.

The *Downing* court then found a way to pin down even the journalist who is willing to go to jail on a contempt charge rather than reveal his sources:

> "Therefore, we hold that when a defendant in a libel action, brought by a plaintiff who is required to prove actual malice under *New York Times*, refuses to declare his sources of information upon a valid order of the court, there shall arise a presumption that the defendant had no source."

*Id.*

Jamerson points out that another state, Hawaii, adopted the "no source" presumption rule. *See DeRoburt v. Gannett,* (D.Hawaii 1981) 507 F.Supp. 880. However, it is important to note that neither New Hampshire nor Hawaii has a shield law and thus their courts follow the "qualified privilege" holding of *Herbert* and subsequent Supreme Court decisions interpreting the limitations of the First Amendment. Moreover, as explained in Anderson Newspapers' brief, no court applying the shield laws of other states has ever indulged a presumption of no sources where the statute was properly invoked. Also, the "no source" presumption was imposed in *Downing* and *DeRoburt* as a sanction where the reporter refused to obey a lawful order to divulge his sources.

## II. *Indiana's Shield Law.*

Jamerson makes the conclusory statement that the Indiana legislature, in amending the shield law to its present form in 1973, acted in "direct defiance" of the *Branzburg* decision which had been handed down only a few months before. He states that it is reasonable to assume that the legislature was simply not cognizant of the *Branzburg* holding, which is that the First Amendment does not provide a testimonial privilege to a journalist so that he is not required to respond to a grand jury subpoena. Perhaps a more accurate deduction to be drawn from the legislature's revision [2] of the shield law is that the legislature, in balancing the conflicting interests of the alleged defamed public figure and the press, simply concluded that the journalist's privilege should prevail.

■ Once again, we are reminded that it was the *Branzburg* decision which specifically allowed that the Supreme Court is powerless to bar state courts from recognizing a newsman's privilege, either qualified or absolute. The existence of a judicial remedy for reputation is purely a matter of state law. *Maressa v. N.J. Monthly,* (1982) 89 N.J. 176, 445 A.2d 376. *See Paul v. Davis, supra.*

The states are split almost evenly between those which have some form of a shield law and those which do not. These shield laws differ as to the scope of their protection, and, to some extent, the class of parties which can invoke their protection. "Recent Developments", 28 Villanova L.Rev. 225 (1982–83).

---

**2.** The 1941 (original) version of the shield law also afforded the news media an absolute privilege; however, it included particular requirements as to the size and circulation of the newspaper.

Eight states [3] have what may be described as the "ultimate" in news media protection; that is, the press has a seemingly unassailable privilege not to disclose the source [4] of any information obtained in the course of employment. Only a few decisions in these states have squarely determined the breadth of their respective state shield laws; generally, the reasoning behind the decisions that the state shield law affords journalists an absolute privilege is that the courts have an obligation to carry out the clear objective and intent of the state legislatures:

> "The legislature's decision then to favor the public's interest in access to information over an individual's state common law right to vindicate his reputation is a matter over which the state has almost complete control and in the circumstances of this case has exercised in a manner adverse to the plaintiff's interest."

*Mazzella v. Philadelphia Newspapers, Inc.,* (E.D.N.Y.1979) 479 F.Supp. 523, 528. *See Maressa, supra; Steaks, Unlimited v. Deaner,* (3rd Cir.1980) 623 F.2d 264; *Ex Parte Sparrow,* (N.D.Ala.1953) 14 F.R.D. 351; *In re Taylor,* (1963) 412 Pa. 32, 193 A.2d 181.

The above language evinces the court's attempt to ascertain the legislature's state of mind when it promulgated the shield law. All of the decisions which have characterized the various shield statutes as affording "blanket protection" have effected a "hands off" approach; that is, the courts defer dubiously to what they discern as the intent of the legislature.

Most states have bestowed only a qualified privilege on the media. The privilege is limited through various means, such as waiver, sanction, and the types of cases for which it may be claimed.

For example, some courts have taken an "ad hoc" balancing approach, such as that taken by the Henry Circuit Court in the instant case. If the defendants raise the shield law barrier, then they are deemed to have waived the law's protection should they attempt to prove their defense through witnesses whose identities are protected by the shield law. *See Mazzella, supra, Greenberg v. CBS, Inc.,* (1979) 69 A.D.2d 693, 419 N.Y.S.2d 988. Several states have incorporated such a waiver provision statutorily. A typical provision appears in Tenn.Code Ann., Sec. 24-1-208 (1980): 24-1-208(a) contains the usual absolute privilege language, and 24-1-208(b) modifies it by stating, "Subsection (a) shall not apply with respect to the source of any allegedly defamatory information in any case where the defendant in a civil action asserts a defense based on the source of such information". The statute then requires the plaintiff to make an application for divestiture to the court and provides statutory requirements for divestiture. The various waiver provisions and judicial interpretations thereof run the gamut from liberal to conservative. *See* N.J.Stat.Ann., Sec. 2A: 84a-21.3(b); Del.Code Ann. tit. 10, Sec. 4325 (1975); *cf.* Nev.Rev.Stat., Sec. 49.385 (1979).

California's shield law is unique amongst the others; it merely provides the journalist immunity from being adjudged in contempt for refusal to disclose his sources. Cal.Evid.Code Ann., Sec. 1070 (West Supp. 1984). *See KSDO v. Superior Court of Riverside County,* (1982) 136 Cal.App.3d

---

3. Ala.Code, Sec. 12-21-142 (1977); Ariz.Rev. Stat.Ann., Sec. 12-2237 (Supp.1982); Ind.Code Ann., Sec. 34-3-5-1 (West 1983); Md.Cts. & Jud.Proc.Code Ann., Sec. 9-112 (1984); Mich. Comp.Laws Ann., Sec. 767.5a (West 1982); Neb. Rev.Stat., Sec. 20-144-147 (1983); N.J.Stat.Ann., Sec. 2A:84a-21, 21a (West Supp.1984-85); 42 Pa.Cons.Stat.Ann., Sec. 5942 (Purdon 1982). New Jersey and Maryland are included even though their shield laws are not "absolutely absolute": New Jersey has a waiver provision (N.J.Stat.Ann., Sec. 2A:84a-21.3, 21.4) as well as an exception for a criminal proceeding, while

the Maryland Court of Special Appeals has interpreted "source" narrowly to mean "informant". *Lightman v. State,* (1972) 15 Md.App. 713, 294 A.2d 149. However, a New Jersey decision, *Maressa, supra,* in no uncertain terms described its state shield law as absolute. Similarly, the language of the Maryland statute is absolute on its face.

4. Some of the states' provisions protect information or identity as well as source.

375, 186 Cal.Rptr. 211. Section 1070 is not deemed a "privilege" in any respect. Further, in *KSDO*, the California Court of Appeals insinuated that the trial court is free to impose other sanctions on the defendant for concealing sources. *KSDO, supra,* 186 Cal.Rptr. at 216 (citation omitted).

A different means used to balance the conflicting interests of the newsman and the allegedly defamed plaintiff is to simply disallow the availability of the shield law to the news medium in a libel or slander action in which it is a defendant. Two states, Illinois and Minnesota have adopted such a method, although the Minnesota statute provides for certain situations in which a journalist may not be required to disclose his sources. Minn.Stat.Ann., Sec. 595.025 (West Supp.1984).

One of the most prevalent methods for easing the harshness of the *New York Times* burden of proof is to allow the plaintiff to challenge the defendant's assertion of the shield law. Once that happens, the court makes whatever inquiry necessary to resolve the issue, engaging in its own balancing test. *See, e.g.,* Alaska Stat. Sec. 09.25.150–.220 (1983); Del.Code Ann. tit. 10, Sec. 4323 (1975). Each of the states developed slightly different factors for the trial judge to consider; further, at least one state requires the plaintiff to show "bad faith, malice, and not in the interest of the public welfare" in order to warrant disclosure of sources. Ark.Stat.Ann., Sec. 43–917, (1977).

Other state courts have adopted the reasoning of *Branzburg, supra,* wherein the U.S. Supreme Court determined that a newsman does not have an absolute First Amendment right not to reveal confidential sources before a grand jury and have modified their shield law through judicial interpretation. *Matter of McAuley,* (1979) 63 Ohio App.2d 5, 408 N.E.2d 697. *See Rosato v. Superior Court of Fresno County,* (1975) 51 Cal.App.3d 190, 124 Cal.Rptr. 427 *cert. denied* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976); *Matter of Farber,* (1978) 78 N.J. 259, 394 A.2d 330, *cert. de-*

*nied* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).

Finally, in *Ammerman v. Hubbard Broadcasting,* (1976) 89 N.M. 307, 551 P.2d 1354, the New Mexico Supreme Court determined that the statute created by the state legislature which afforded an absolute privilege for journalists and news media was constitutionally invalid because the promulgation of procedural matters is within the exclusive power of the district courts of New Mexico under the state constitution. *Ammerman, supra,* 551 P.2d at 1359.

### III. *Violation of Article 1, Section 12 of Indiana Constitution.*

This issue appears to be the crux of Jamerson's appeal. Jamerson contends that it is the constitutional right of a public official or figure to maintain an action for injury to his reputation, and neither the courts of this state, nor the legislature, can abolish or limit the remedy without amending the Indiana Constitution.

Article 1, Section 12 of the Indiana Constitution provides in part:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation shall have remedy by due course of law."

Jamerson notes that the above provision gives "every man" a remedy for injury done to his reputation. He adds that "every man" does not exclude public officials. Jamerson states with presumption, "examining the Indiana Constitution, there seems to be no doubt as to its meaning"; i.e., that the right to bring a common law action is a fundamental right, but he cites no authority for this assertion.

"It is well settled in Indiana that ability to bring a cause of action does not rise to the level of a fundamental right for constitutional privileges." *Scalf v. Berkel, Inc.,* (1983) Ind.App., 448 N.E.2d 1201, 1203. The legislature clearly has the power to abrogate or modify common law rights and remedies. *Dague v. Piper Aircraft Corp.,* (1981) Ind. 418 N.E.2d 207.

*See Sidle v. Majors,* (1976) 264 Ind. 206, 341 N.E.2d 763. One of the acknowledged functions of legislation is to change the common law to reflect change of time and circumstances. *Sidle, supra,* 341 N.E.2d at 774.

■ Since Indiana courts have uniformly held, in cases involving injury to "person" or "property", that Art. I, Sec. 12 does not prevent the legislature from modifying or restricting common law rights and remedies, then these precedents are dispositive of Jamerson's claim as to a fundamental right to a remedy for injury to his reputation. *See Dague, supra,* (provisions of Indiana Product Liability Act are constitutional; Act does not violate Art. I, Sec. 12 by restricting or cutting off claims); *Johnson v. St. Vincent Hospital,* (1980) 273 Ind. 374, 404 N.E.2d 585 (Medical Malpractice Act does not violate Art. I, Sec. 12 simply because it alters the standing manner of achieving a remedy in court or restricts a longstanding remedy); *Sidle, supra,* (Indiana Guest Statute does not violate Art. I, Sec. 12); *Beecher v. White,* (1983) Ind.App. 447 N.E.2d 622 (IND.CODE 34-4-20-2 providing for ten-year statute of limitations for actions to recover damages for deficiency in design, planning, supervision, construction or observation of improvement in real property does not violate Art. 1 Secs. 12 and 23 and Art. 4, Secs. 22 and 23 of the Indiana Constitution). It would be illogical to assume that "reputation" affords any greater constitutional protection than "property" or "person".

Jamerson's "no source" presumption argument resurfaces here as he contends the only method which would provide him with due process of law in meeting his burden of proof is the presumption of no sources if a defendant is unwilling to name his sources.

Appellees ably point out that to hold that a presumption of no sources is constitutionally required would emasculate the protection afforded by the shield law: Jamerson is asking the Court of Appeals to engage in judicial legislation by substituting its will for that of the legislature. "Indiana has long held, as a matter of the common law

of privilege, that *no* adverse inference may be drawn from the invocation of statutory privilege." Appellee's brief, pg. 14. The newspapers cite several cases for this proposition; the leading case is *Brackney v. Fogle,* (1901) 146 Ind. 535, 60 N.E. 303.

*Brackney* involved a will contested because of alleged mental unsoundness of the testatrix. At trial, the plaintiffs called the testatrix's physician, and defendants objected on the ground of the physician-patient privilege. The testimony was not allowed, and the trial court permitted plaintiffs' attorney to comment on the suppression of the doctor's testimony during closing argument. *Brackney, supra,* at 537, 60 N.E. 303. The attorney speculated that the testimony would have been adverse to the defendants' cause. Further, the trial court instructed the jury that it could consider the doctor's failure to testify in determining the case. *Id.* at 538, 60 N.E. 303.

The Supreme Court, in overturning the decision, stated:

"Shall the efficacy of the statute be destroyed by indirection? To claim the protection of the statute is the legal right of the patient, or his representative, of no less inviolability than any other personal right, and it is wholly inconsistent with that right to say that its exercise in a judicial proceeding shall be allowed to prejudice the cause of him who claims it."

*Id.* at 539, 60 N.E. 303.

Appellees cite other decisions which support the reasoning of *Brackney,* such as *William Laurie Co. v. McCullough,* (1910) 174 Ind. 477, 90 N.E. 1014 and *Metropolitan Life Insurance Co. v. Fidelity Trust Co.,* (1938) 214 Ind. 134, 14 N.E.2d 911.

## IV. *Standard of Proof—Conspiracy.*

■ Jamerson alleges that the trial court erred in that it applied an improper standard and required him to prove conspiracy by clear and convincing evidence instead of by a preponderance of the evidence.

Count II of Jamerson's complaint states that defendant Anderson Newspapers,

through its officers and agents, "... entered into a conspiracy designed and intended to libel, slander, defame, injure, and damage this plaintiff".

The trial court found in part:

"9. The defendants are entitled to judgment in their favor on Count II of the amended complaint, the plaintiff's conspiracy claim. The plaintiff failed to prove any agreement or common scheme to defame the plaintiff, and, as a matter of law, a corporation cannot conspire with its agent."

Conclusion of Law, No. 9.

Jamerson's allegation concerning the "clear and convincing evidence" standard is based upon the following comments of the trial judge:

"I think we would note, too, that the language of [T.R.] 41(B) does not make it mandatory that the court find facts and render judgment at the conclusion of the plaintiff's case. Therefore, the court can apply the ultimate test, which I feel in this case is clear and convincing evidence, can make findings and enter judgment on all or a portion of plaintiff's case, or may decline to find facts and render judgment, in which case the defendants would be then required to elect whether to present evidence."

R. 227.

Appellant alleges the only "reasonable" interpretation of the above comments is that the trial judge required proof of conspiracy by clear and convincing evidence. Appellees, on the other hand, argue that Jamerson has taken the comment out of context: the comment was made by Judge Kellam as part of a discussion concerning T.R. 41(B) and whether it allows the trial judge to grant a motion to dismiss in part. The above-quoted comments are the only evidence tendered by Jamerson to substantiate his claim that the trial judge applied the "clear and convincing evidence" standard to his conspiracy count.

Appellees argue that Jamerson's appeal on this issue must fail because he did not carry his burden of establishing that the trial court committed error. The newspa-

pers cite, among other decisions, *Matter of VMS*, (1983) Ind.App., 446 N.E.2d 632, for the proposition that it is appellant's burden to show the Court of Appeals wherein the trial court erred. In *Matter of VMS*, the parents argued that the trial judge did not employ the clear and convincing evidence standard in terminating their parent-child relationship pursuant to IND.CODE 31–6–5–4(2). Judge Ratliff, writing for the court, stated:

"Likewise, the parents have failed to convince us that the trial court employed a standard of proof lower than clear and convincing evidence to support the allegations required by the statute. The record here, unlike the case of *Ellis v. Knox County Department of Public Welfare* [(1982) Ind.App., 433 N.E.2d 847, 848.], does not affirmatively attest to the court's use of an improper standard.... We do not presume that the trial court erred, *English Coal Company, Inc. v. Durcholz*, (1981) Ind.App., 422 N.E.2d 302, ·307, but presume instead that the trial court correctly applied the law. *Merchants National Bank & Trust v. H.L.C. Enterprises*, (1982) Ind. App., 441 N.E.2d 509, 511; *Cornett v. Cornett*, (1981) Ind.App., 412 N.E.2d 1232, 1235."

*Matter of VMS, supra,* at 637.

As in *Matter of VMS*, the record on appeal does not affirmatively attest to the proposition that the trial court employed the "clear and convincing evidence" standard to his conspiracy count. Jamerson chose not to include any of the evidence introduced during the trial in his record on appeal.

■ Jamerson argues further that the trial court incorrectly applied the holding of *Soft Water Utilities v. LeFevre* (1974) 159 Ind.App. 529, 308 N.E.2d 395 that "as a matter of law, a corporation cannot conspire with its agents" to his Count II, the conspiracy claim. He concedes that, generally, the above statement is true and conspiracy requires two or more persons or entities. However, he claims that Count II

alleged damages from a conspiracy among Anderson Newspapers' personnel and other persons; the count was not based upon any conspiracy between the corporate defendant and its agents acting within the scope of their employment. Therefore, the rule stated in *Soft Water Utilities* is inapplicable to his Count II.

Our examination of Jamerson's complaint leads to the conclusion that Appellant's attempt to extricate Count II from the rule of law cited by the trial judge is groundless. The count states:

"That at some time during the year 1972, *defendant Anderson Newspapers, Inc., through its officers and agents ... entered into a conspiracy* designed and intended to libel, slander, ... this plaintiff ... *by and through diverse persons within the news and editorial departments of the defendant ...*" (Our emphasis).

The count goes on to allege that the conspiracy was carried out in a "systematic fashion by the publication of false and malicious articles in the Anderson Newspapers". The only parties named in the count are the defendant Anderson Newspapers and its officers and agents. The "conspiracy" was carried out by the publication of articles written by persons within the news and editorial departments of the defendant. Obviously, the reporters were acting within the scope of their employment.

### V. *Ruling on Opinion.*

The trial court found:

"Statements of opinion are privileged under the First Amendment. *Gertz v. Robert Welch, Inc.,* (1974) 418 U.S. 323, 339–340 [94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789]. Therefore, the defendants are entitled to judgment in their favor on all statements that the court finds were opinion."

Jamerson asserts the above conclusion is too sweeping, and he cites *Greenberg v. CBS, Inc.,* (1979) 69 A.D.2d 693, 419 N.Y.S.2d 988 for what he considers to be the correct legal standard in regard to statements of opinion: "[t]he law is settled that opinions are constitutionally protected, *provided the facts supporting the opinion are set forth as its bases.* However, if the facts are false, the opinion is actionable." *Greenberg, supra,* 419 N.Y.S.2d at 993 (all citations omitted). Seizing the above-emphasized phrase, Jamerson alleges that he was denied a fair trial since the trial judge either failed to look beyond the statement of law cited in his conclusion, i.e., "opinions are constitutionally protected", or failed to require the press to include the facts upon which it printed an opinion. Appellant's brief, pg. 87.

This area of defamation law, which initially appears so clear-cut, is actually somewhat confusing. A starting point for the discussion on opinion is *Gertz v. Robert Welch, Inc.,* the U.S. Supreme Court case cited by the trial judge in his conclusion of law. In *Gertz,* the Supreme Court stated, "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz, supra,* 418 U.S. at 339–340, 94 S.Ct. at 3006–3007. Thus, the Supreme Court distinguishes between false statements of fact, which receive no constitutional protection, and ideas and opinions, which by their very nature cannot be false so as to constitute false statements which are actionable when made with actual malice. *Buckley v. Littell,* (2nd Cir.1976) 539 F.2d 882. *See McManus v. Doubleday & Co.,* (S.D.N.Y. 1981) 513 F.Supp. 1383.

■ Whether a particular statement constitutes fact or opinion is a question of law. *Rinaldi v. Holt, Rinehart & Winston, Inc.,* (1977) 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied* (1977) 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456. "The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and context of the communica-

tion taken as a whole." *Greenberg, supra,* 419 N.Y.S.2d at 993.

Opinions concerning the performance of public officials are particularly deserving of protection under the First Amendment. *Rinaldi, supra,* concerned an action in libel by a New York Supreme Court justice against the author and publisher of articles containing assertions that plaintiff was incompetent, "probably corrupt", and should be removed from office. *Id.* 397 N.Y.S.2d at 950–952, 366 N.E.2d at 1306–1307. The *Rinaldi* court stated that "comments and opinions on judicial performance are a matter of public interest and concern." *Id.* 397 N.Y.S.2d at 950, 366 N.E.2d at 1306. It went on to state that the expression of opinion, "even in the form of perjorative rhetoric", relating to performance while in judicial office, is safeguarded. *Id.*

Similarly, in the present case, Jamerson was the Anderson Police Chief and thus held a position in which the public has a vital interest. As a public official Jamerson ran the risk of closer public scrutiny.

Most of the opinions in this case were contained in a three-part series of articles written by Jeff Evans in July 1978. The articles described a "tired" Anderson Police Force and included many comments from unidentified police officers or ex-police officers. For example, the following statements were included in the articles and were determined by the trial judge to be statements of opinion, not fact:

> "Most officers who agreed to talk with the Herald say only a change in the front office personnel would improve the force. They (Jamerson, Joyce, and Inspector Don Perechinsky) were the worst three leaders I have ever worked under. That the front office practiced at shooting down morale. Someday Paddy Jamerson and others will send someone to be a patsy, to spy, or to overlook a crime. He will then become the scapegoat."

All of these statements are opinionative and not factual in nature, therefore, they cannot constitute falsehoods. *Miskovsky v. Oklahoma Publishing Co.,* (1983) Okl., 654 P.2d 587, *cert. denied* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). If they are not false statements of fact, then they are absolutely protected under the First Amendment. Thus, it is clear that the trial court's conclusion as to the state of the law in this area is an accurate one.

Appellees further assert that any error on the opinion issue is harmless, because the trial court found that Jamerson failed to prove other essential elements of liability. Appellees' brief, pg. 45. The newspapers note that no error is charged in this appeal with respect to those holdings; Jamerson even admits that the *N.Y. Times* test of actual malice must also be met in regard to these opinionative statements. Appellees state that "even assuming the statements were of fact rather than opinion … Mr. Jamerson failed to prove actual malice as to every statement and falsity as to four of them". Thus since Jamerson does not contest the trial court's determination that he failed to meet his *N.Y. Times* burden of proof, any error as to the law of opinion is rendered harmless.

For the above-stated reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON, J., and YOUNG, J., (sitting by designation), concurs.