# FOR PUBLICATION

ATTORNEYS FOR APPELLANT
NON-PARTY INDIANA
NEWSPAPERS, INC. d/b/a
THE INDIANAPOLIS STAR:

**JAN M. CARROLL**
**PAUL L. JEFFERSON**
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
LEE ENTERPRISES, INC., ET AL.:

**CHARLES D. TOBIN**
Holland & Knight LLP
Washington, D.C.

**STEVEN C. SHOCKLEY**
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
PUBLIC CITIZEN, INC.:

**PAUL ALAN LEVY**
Public Citizen Litigation Group
Washington, D.C.

**STEVEN M. BADGER**
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
JEFFREY M. MILLER AND
CYNTHIA S. MILLER:

**KEVIN W. BETZ**
**JAMIE A. MADDOX**
Betz & Blevins
Indianapolis, Indiana



FILED
Feb 21 2012, 9:16 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE: INDIANA NEWSPAPERS INC., )
d/b/a THE INDIANAPOLIS STAR, )
                                        )
       Appellant-Non-Party, )
                                          )
JEFFREY M. MILLER & CYNTHIA S. )
MILLER, )
                                          )

Appellees-Plaintiffs,                    )
                                         )
vs.                                      )          No. 49A02-1103-PL-234
                                         )
JUNIOR ACHIEVEMENT OF CENTRAL            )
INDIANA, INC.; JENNIFER BURK,            )
Individually and in her Official Capacity;  )
CENTRAL INDIANA COMMUNITY                )
FOUNDATION, INC.; BRIAN PAYNE,           )
Individually and in his Official Capacity,  )
                                         )
Appellees-Defendants.                    )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable S. K. Reid, Judge
Cause No. 49D14-1003-PL-14761

**February 21, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

In keeping up with the proliferation of the internet and social media, news organizations allow readers to both read and comment on their stories online. While this practice facilitates discourse between readers and interaction with their online news products, it also opens the door to potentially objectionable material, as readers are allowed to post comments anonymously, hiding behind a pseudonym. This case addresses whether a non-party news organization can be compelled to disclose to a plaintiff who has filed a defamation lawsuit the identity of one such anonymous commenter. In order to analyze this issue of first impression in our state, we consider Indiana's Shield Law, which provides an absolute privilege to the news media not to disclose the source of any information obtained in the course of employment, the First

Amendment, which has a celebrated history of vigorously protecting anonymous speech, and the Indiana Constitution, which more jealously protects freedom of speech guarantees than the United States Constitution.

Under our Shield Law, we hold that an anonymous person who comments on an already-published online story and whose comment was not used by the news organization in carrying out its newsgathering and reporting function cannot be considered "the source of any information procured or obtained in the course of the person's employment or representation of a newspaper" according to Indiana Code section 34-46-4-2. Under the United States Constitution, to strike a balance between protecting anonymous speech and preventing defamatory speech, we adopt a modified version of the *Dendrite* test, requiring the plaintiff to produce prima facie evidence of every element of his defamation claim that does not depend on the commenter's identity before the news organization is compelled to disclose that identity. With this test being called the most speech-protective standard that has been articulated and neither party advocating a different test, we adopt the modified version of the *Dendrite* test under the Indiana Constitution as well.

**Facts and Procedural History**

Jeffrey Miller was president and CEO of Junior Achievement of Central Indiana, Inc. from September 1994 until his retirement on December 31, 2008. Jennifer Burk replaced Miller as President and CEO of Junior Achievement. After his retirement from Junior Achievement, Miller continued in his role as president of the Experiential

3

Learning and Entrepreneurship Foundation ("the Foundation"), an organization that supported Junior Achievement, until February 2010.

In May 2008, during Miller's tenure as president, a three-way collaborative project was announced between the Foundation, Junior Achievement, and Ivy Tech Community College for the Foundation to construct a $4 million culinary school on the Junior Achievement campus to be financed in part by a $2 million grant from the Central Indiana Community Foundation/Eugene Glick family ("The Glick Fund"). Brian Payne is president of Central Indiana Community Foundation. As a result of this collaboration, Ivy Tech would lease the culinary school from the Foundation once the school was fully constructed and furnished with the latest culinary equipment.

Construction began in August 2009 but was suspended in January 2010 because The Glick Fund stopped paying for the invoices submitted by the Foundation even though there was sufficient money in the fund. Miller claims that the funding stopped because Burk and Payne made allegations that he somehow misappropriated the funds that had already been distributed. Specifically, Miller alleges that Burk made the following defamatory statements:

(1) On October 22, 2009, Burk stated during a Junior Achievement Executive Committee meeting that Miller had been "very dishonest" about funds she believed should be available to Junior Achievement.

(2) In the fall of 2009, Burk told Sharon Lents, the former Junior Achievement Chief Operating Officer, that "Jeff Miller's House of Cards is about to fall down."

(3) In March 2010, Burk stated that she was distancing Junior Achievement from Miller and the Foundation, which implies that Miller had misappropriated the funds.

4

Appellant's App. p. 28. As for Payne, Miller alleges that in early 2010, he was in discussions with individuals in Mayor of Indianapolis Greg Ballard's office regarding the position of Senior Policy Advisor. Miller alleges that a job announcement was scheduled for the end of February when Payne told Mayor Ballard's Chief of Staff that Miller had misappropriated funds and there were concerns regarding Miller and the way money from The Glick Fund was inappropriately moved around at Junior Achievement and the Foundation. Mayor Ballard's Chief of Staff withdrew Miller's employment offer. Miller claims that Burk's and Payne's statements are false.

After Burk and Payne allegedly made these defamatory statements, The Indianapolis Star ("The Star") published an online news article on March 19, 2010, entitled "Junior Achievement faces questions, audit." *Id.* at 64. The article stated that Junior Achievement was "facing a series of questions about its own financial affairs – questions about missed payments to contractors on a building project and unaccounted-for grant money." *Id.* The article also stated that Payne said The Glick Fund had "halted payment" and those payments "won't resume . . . until an independent auditor can sort out what's become of the $765,000 in grant payments that Junior Achievement has already received." *Id.*

On April 6, 2010,[1] an anonymous commenter using the pseudonym "DownWithTheColts" posted the following comment about the story on indystar.com:

---

[1] Miller asserts that this is the date the anonymous commenter made the post. However, the actual comment indicates that it was posted at 11:48 a.m. on March 23, 2010. *See* Appellant's App. p. 66. The Star notes that "[n]othing in the record indicates the trial court relied on either date to support its Order, and The Star does not assert the privilege analysis needs a determination of the correct date." Appellant's Br. p. 4.

> This is not JA's responsibility. They need to look at the FORMER president of JA and others on the [Foundation] board. The "missing" money can be found in their bank accounts.

*Id.* at 66. The Star concedes that there is no evidence in the record that it used this comment in any way, such as to pursue the lead for a follow-up story.

That "DownWithTheColts" commented on an online news article has become commonplace today. "As news organizations have experimented with ways to encourage their readers to interact with their online news products, one of the most popular options has been to allow readers to post comments adjacent to a story." Jane E. Kirtley, *Mask, Shield, and Sword: Should the Journalist's Privilege Protect the Identity of Anonymous Posters to News Media Websites?*, 94 Minn. L. Rev. 1478, 1488 (2010). Although this can facilitate robust discussion and promote a "conversation" between journalists and their readers, it has also encouraged "moronic, anonymous, unsubstantiated and often venomous [speech]." *Id.* at 1488-89 (quotation omitted). "This is particularly likely to occur when posters are permitted to use a pseudonym, or remain anonymous." *Id.* at 1489; *see also* Ashley I. Kissinger & Katharine Larsen, *Protections for Anonymous Online Speech*, 1068 PLI/Pat 815, 822 (Nov. 2011) ("Millions of people communicate on the Internet every day. They choose a login name other than their own to post comments on websites or in other fora, they share files without sharing their names, and they avoid providing any personal information when registering for email addresses and blogs. . . . As the number of so-called 'anonymous' users of the Internet has continued to rise, so have efforts to 'unmask' them."). As shown below, a common compromise is to require users to register with the website, provide some form of identifying information, and

agree to abide by the news organization's Terms of Service and/or Privacy Policy. Kirtley, 94 Minn. L. Rev. at 1489.

Before the comment by "DownWithTheColts," the editor of The Star, Dennis Ryerson, announced that his newspaper would begin requiring commenter registration and take other steps, such as segregating comments from stories, in response to reader complaints about offensive rants. Jason A. Martin, Mark R. Caramanica & Anthony L. Fargo, *Anonymous Speakers and Confidential Sources: Using Shield Laws When They Overlap Online,* 16 Comm. L. & Pol'y 89, 90 (Winter 2011) (citing Dennis Ryerson, *Story Comments Welcome—If Tone is Civil*, The Indianapolis Star, Jan. 10, 2010, at B7).[2] Then, while this case was on appeal, Ryerson announced yet a new change for his paper, connecting posts to a commenter's Facebook identity[3]:

> For several years we have allowed users of IndyStar.com, our main news website, to provide their comments with stories we post. Our intent was to

---

[2] An April 2010 article in The New York Times on this point notes:

> When new sites, after years of hanging back, embraced the idea of allowing readers to post comments, the near-universal assumption was that anyone could weigh in and remain anonymous. But now, that idea is under attack from several directions, and journalists, more than ever, are questioning whether anonymity should be a given on news sites.

Richard Perez-Pena, *News Sites Rethink Anonymous Online Comments*, N.Y. Times, Apr. 11, 2010, www.nytimes.com/2010/04/12/technology/12comments.html. The article noted that The Washington Post, The New York Times, The Post, The Huffington Post, and many others had moved in stages toward requiring that people register before posting comments and provide information about themselves that is not shown onscreen. *Id.*

[3] On December 5, 2011, Miller filed a Notice of Additional Authority citing Ryerson's article as additional authority (as well as an article from a Detroit newspaper). On December 9, The Star filed a motion to strike Miller's notice of additional authority because "Newspaper columns published nearly two years after the anonymous source's comments at issue in this appeal do not constitute 'authority.'" *Indiana Newspapers, Inc. v. Miller*, No. 49A02-1103-PL-234 (Dec. 9, 2011). In an order issued today, we deny The Star's motion to strike and note that while we reference Ryerson's article, we do so merely to explain the background of this case, and not as authority when analyzing the merits.

use the Internet to provide immediate reader comment as stories were breaking.

Unlike our signature requirements for letters to the editor, we have allowed anonymous comments on IndyStar.com.  Our theory was that robust conversation would promote more conversation and that we should not restrict the openness of the worldwide web.

It didn't work as intended, which is why, beginning Tuesday [November 29, 2011], we will be moving all story comment to the Facebook social network site.

We're doing this because along with anonymity has come an unacceptable level of hatred, crude language and other nastiness.

We've tried to limit it.  First, we hid the comments so they wouldn't automatically appear with a story.  If readers wanted to read the posts they could, but they needed to request access to the comments.

It was a small step in the right direction, but it wasn't sufficient.

We then contracted with an outside monitoring service to help us assess and remove comments users flagged as objectionable.

That helped as well, but still the abuses continued.

Several newspapers have "beta" tested Facebook comments and universally found that tying comments to a person's Facebook identity promotes civil discourse.  An ambitious study by the Los Angeles Times allowed readers to post comments anonymously while other readers were directed to Facebook.  The latter significantly reduced name-calling and other bad behavior.

No system is perfect.  Not all readers have or want Facebook accounts. Some individuals may have worthy comment or news about an institution or business, but because of the fear of offending a boss or colleague won't offer it if they can be identified.

But I'm convinced that many, many more people are avoiding comment now because they don't want to participate in what they perceive as a gutter of ugliness.

Story comment is a privilege, not a right.  Under the First Amendment, news organizations may exercise any standards they deem appropriate for

online or print platforms. If people want to be less than civil with their remarks, fine by me. They'll just have to do it someplace other than on IndyStar.com.

Dennis Ryerson, Editorial, *Move to Facebook Comments is Meant to Keep the Conversation Civil*, The Indianapolis Star, Nov. 27, 2011, www.indystar.com/apps/pbcs.dll/article?AID=2011111270379.[4]

The Star's Privacy Notice, which governs how information from its online users is collected and used, contains a subsection entitled How We Collect and Use Information. It provides, in pertinent part:

> Please be aware that we may occasionally release information about our visitors if required to do so by law or if, in our business judgment, such disclosure is reasonably necessary: (a) to comply with legal process; (b) to enforce our Terms of Service; or (c) to protect the rights, property, or personal safety of our Site, us, our affiliates, our officers, directors, employees, representatives, our licensors, other users, and/or the public.

*Privacy Notice*, The Indianapolis Star, http://www.indystar.com/section/privacy (last updated Nov. 9, 2011). The Star's Terms of Service includes a subsection entitled Responsibility for User-Provided Content, which generally provides: (1) commenters have read and agree to the rules; (2) the materials will not violate the rights of or cause injury to any person or entity; (3) commenters are responsible for materials posted; (4) The Star does not control the messages; (5) The Star has no obligation to monitor any information; (6) commenters will indemnify The Star and hold it harmless; and (7) The

---

[4] And on November 30, 2011, The New York Times introduced a similar policy that requires "trusted commenters," whose posts do not have to be screened, "to connect [their] Facebook account and [their] commenting profile to verify [their] name and location." Jill Abramson, Editorial, *A Note to Our Readers About Comments*, link to *Trusted Commenters,* N.Y. Times, Nov. 30, 2011, www.nytimes.com/content/help/site/usercontent/trusted/trusted-commenters.html#trusted-facebook-connect.

9

Star may disclose the material. *Terms of Service*, The Indianapolis Star, http://www.indystar.com/section/terms (last updated Jan. 21, 2011).[5]

Miller[6] filed a complaint alleging, among other claims, defamation against Junior Achievement, Central Indiana Community Foundation, and their respective presidents, Burk and Payne. Appellant's App. p. 24. Thereafter, Miller sought non-party[7] discovery from The Star requesting the following:

> Any and all records, documents, including electronic information or documents and/or digital information of all kinds, log files, reports, notes or any other documentation, relating to the posting and/or identity of "DownWithTheColts," the individual who posted a comment on the article titled "Junior Achievement faces questions, audit" (dated March 19, 2010) posted on IndyStar.com.

*Id.* at 62.

After Miller unsuccessfully tried to obtain the requested discovery from The Star, he resorted to the courts and filed a motion to compel discovery. *Id.* at 16 (CCS), 52. The Star filed an extensive brief in opposition to Miller's motion to compel claiming

---

[5] We note that Miller, who relies on the Privacy Notice and Terms of Service for his argument, does not provide us with The Star's Privacy Notice and Terms of Service that were effective when "DownWithTheColts" made the anonymous post. Rather, he refers us to the current ones. As noted above, however, the Privacy Notice and Terms of Service were last updated November 9, 2011, and January 21, 2011, respectively. Nevertheless, The Star does not argue that the Privacy Notice and Terms of Service, which Miller quotes in his brief, have been substantially updated since "DownWithTheColts" commented on the online newspaper article.

[6] Miller later amended his complaint to add his wife, Cynthia S. Miller, as a plaintiff and a claim for her loss of consortium. Appellant's App. p. 10 (CCS), 24. Nevertheless, we continue to refer to the plaintiffs in the singular as "Miller" and note that Cynthia's claim rises and falls with her husband's defamation claim.

[7] The Communications Decency Act (CDA) bars plaintiffs from holding internet service providers (ISPs) and website operators legally responsible for information posted independently by third parties. *See* 47 U.S.C.A. § 230(c) (2001); Matthew Mazzotta, Note, *Balancing Act: Finding Consensus on Standards for Unmasking Anonymous Internet Speakers*, 51 B.C. L. Rev. 833, 842 n.73 (2010). Accordingly, Miller cannot sue The Star for the post at issue.

privilege under Indiana's Shield Law and that the anonymous speech was protected by the United States and Indiana Constitutions. *Id.* at 75. The Star included a verified declaration from Jonathan Sweeney, The Star's digital news director. Specifically, Sweeney is employed and receives income as the "digital news director for The Indianapolis Star, a daily newspaper of general circulation published in Indianapolis, Indiana." *Id.* at 110. Sweeney reports to Scott Goldman, a senior editor who serves as the newsroom's director of digital and visuals, who in turn reports to Ryerson. *Id.* According to Sweeney, before readers can provide content to indystar.com or provide commentary on the website about editorial content supplied by The Star, "they are required to provide the website with information about themselves. The Star maintains this information about the source of reader-supplied content and commentary, and does not publish or otherwise disclose it." *Id.* at 111.

Miller amended his complaint to add numerous individuals and businesses, including John Doe #3 a/k/a "DownWithTheColts," as defendants. *Id.* at 16 (CCS). Specifically, in his defamation per se claim, Miller alleged that the defendants' statements about his misappropriation of funds were "unfounded" and "made with the knowledge that they were false or with reckless disregard for whether they were true or false so as to indicate a conscious indifference to the rights of Mr. Miller." Appellee's App. p. 14. The trial court granted this motion. Appellant's App. p. 16; Appellee's App. p. 1.

Without holding a hearing, the trial court issued an order compelling discovery.[8]

This order provides, in pertinent part:

> Non-Party The Indianapolis Star is hereby ORDERED to produce immediately the following:
>
> 1. Any and all records, documents, including electronic information or documents and/or digital information of all kinds, log files, reports, notes or any other documentation, relating to the posting and/or identity of "DownWithTheColts," the individual who posted a comment on the article titled "Junior Achievement faces questions, audit" (date March 19, 2010) posted on IndyStar.com.

Appellant's App. p. 113.

The Star now appeals the trial court's order compelling discovery of the identity of "DownWithTheColts," which has been stayed pending appeal.[9] Two amici curiae are participating in this appeal, both on behalf of The Star: (1) Public Citizen, Inc., which is a public-interest organization in Washington, D.C., and (2) numerous media organizations, Lee Enterprises, Incorporated (The Times of Northwest Indiana), LIN Television Corporation d/b/a LIN Media, The E.W. Scripps Company, Gray Television, Inc., Hoosier State Press Association, and The Electronic Frontier Foundation (collectively "Lee Enterprises"). We held oral argument in December 2011.

**Discussion and Decision**

---

[8] Miller also sought discovery from other non-party news organizations, such as The Indianapolis Business Journal and WRTV-6. These websites also contained alleged defamatory comments about Miller from commenters with pseudonyms. *See* Appellee's App. p. 34-38. It appears that The IBJ and WRTV-6 complied with Miller's discovery requests, with the exception of one comment of a sexual nature on WRTV-6 which the news station did not provide discovery on. *See* Appellee's Br. p. 13 (noting that an emergency hearing on this matter had been scheduled for August 17, 2011, which was after the briefs in this case were filed). The Star points out in its reply brief that it "is not bound by other news organizations' decisions." Appellant's Reply Br. p. 7.

[9] The CCS reflects that The Star filed a motion to stay order pending appeal and Miller opposed a stay, but the CCS does not reflect whether it was granted. *See* Appellant's App. p. 18, 22.

In this issue of first impression in our state, The Star raises three main defenses that it claims protect it from being compelled to disclose the identity of "DownWithTheColts": (1) Indiana's Shield Law; (2) the First Amendment right to anonymous speech; and (3) Article 1, Section 9 of the Indiana Constitution. The amici curiae in this case focus their briefs on issue two, anonymous speech under the First Amendment.

Miller argues that the identity of "DownWithTheColts" is essential to his defamation claim because without the identity, he has no means to identify the anonymous commenter and hold him accountable for his malicious defamation on indystar.com. This requires us to carefully balance the rights of Miller to seek redress for injury, The Star's right not to disclose the identity of the anonymous commenter "DownWithTheColts" under our Shield Law, and the right of "DownWithTheColts" to speak anonymously.

The rules of discovery are designed to "allow a liberal discovery process, the purposes of which are to provide parties with information essential to litigation of the issues, to eliminate surprise, and to promote settlement." *Hatfield v. Edward J. DeBartolo Corp.*, 676 N.E.2d 395, 399 (Ind. Ct. App. 1997), *reh'g denied*, *trans. denied*. Our review of discovery matters is limited to determining whether the trial court abused its discretion. *Bridgestone Ams. Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 191 (Ind. 2007). An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the trial court has misinterpreted the law. *Id.*

## I. Indiana's Shield Law

The Star first contends that Indiana's Shield Law protects it from being compelled to disclose the identity of the anonymous commenter, "DownWithTheColts."

Traditionally, a newsgatherer, in the absence of a statute or court rule to the contrary, has no privilege to conceal and may be compelled to disclose in a legal proceeding before a court, grand jury, or other governmental bodies the confidential information or the identity of a confidential source of information obtained by him in his professional capacity. Romualdo P. Eclavea, Annotation, *Privilege of Newsgatherer Against Disclosure of Confidential Sources or Information*, 99 A.L.R.3d 37 (Supp. 2011). "Neither the common law nor the United States Constitution[10] give a newsperson a privilege to refuse to disclose the identity of a person, or 'source,' who gave the newsperson information." 12 Robert Lowell Miller, Jr., *Indiana Practice: Indiana Evidence* § 501.582 (3rd ed. 2007) (footnotes omitted).

This common-law rule of disclosure, however, has been abrogated or modified in some states by the enactment of statutes commonly known as "shield laws." Eclavea, 99 A.L.R.3d 37 (footnote omitted). To date, approximately thirty-nine states and the District of Columbia have enacted reporter shield laws. *See* Joshua A. Faucette, Note, *Your Secret's Safe With Me . . . Or So You Think: How the States Have Cashed in on*

---

[10] The United States Supreme Court held in the seminal case of *Branzburg v. Hayes*, 408 U.S. 665 (1972), that reporters called to testify before a grand jury do not enjoy a First Amendment "conditional" privilege to refuse disclosure of confidential sources or information gathered in the course of reporting. *In re WTHR-TV*, 693 N.E.2d 1, 10 (Ind. 1998). The *Branzburg* Court suggested that journalists could seek protection for sources through state legislatures. 408 U.S. at 706. In addition, the *Branzburg* Court noted, "It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a news[person]'s privilege, either qualified or absolute." *Id.*

14

*Branzburg's "Blank Check*," 44 Val. U. L. Rev. 183, 187 n.31 (2009) (listing thirty-five states plus District of Columbia); *State Shield Law Statutes*, Media Law Resource Center, http://www.medialaw.org/Template.cfm?Section=State_Shield_Law_Statutes (last visited Nov. 17, 2011) (listing four additional states that have since adopted shield laws); *see also* Martin et al., 16 Comm. L. & Pol'y at 105 n.90. These laws generally grant newsgatherers the privilege – of varying breadth or nature – not to disclose in a legal proceeding the information or the source of information obtained by them in their professional capacity. Eclavea, 99 A.L.R.3d 37; *see also* 81 Am. Jur. 2d *Witnesses* § 526 (2004) ("In some jurisdictions, a statutory 'shield law' provides those who collect, edit, or publish news at least a qualified privilege in a legal proceeding or investigation from disclosing the source of any information obtained by him or her."). Federal law has no statutory equivalent to the various states' shield laws. *Too Much Media, LLC v. Hale*, 20 A.3d 364, 374 (N.J. 2011). The extent of a newsperson's privilege under federal law derives from the First Amendment, *id.*, and the anonymous speech aspect of the First Amendment is addressed later in this opinion.

Indiana's Shield Law is codified at Indiana Code chapter 34-46-4 (formerly Indiana Code chapter 34-3-5). Our Shield Law has only two sections. Specifically, Indiana Code section 34-46-4-2 provides:

> A person described in section 1 of this chapter shall not be compelled to disclose in any legal proceedings or elsewhere *the source of any information* procured or obtained in the course of the person's employment or representation of a newspaper, periodical, press association, radio station, television station, or wire service, whether:
>
> > (1) published or not published:
> >     (A) in the newspaper or periodical; or

(B) by the press association or wire service; or

(2) broadcast or not broadcast by the radio station or television station;

by which the person is employed.

(Emphasis added). The other section, Indiana Code section 34-46-4-1, in turn, provides that the chapter applies to:

(1) any person connected with, or any person who has been connected with or employed by:

(A) a newspaper or other periodical issued at regular intervals and having a general circulation; or

(B) a recognized press association or wire service;

as a bone fide owner, editorial or reportorial employee, who receives or has received income from legitimate gathering, writing, editing and interpretation of news.

(2) any person connected with a licensed radio or television station as owner, official, or as an editorial or reportorial employee who receives or has received income from legitimate gathering, writing, editing, interpreting, announcing or broadcasting of news.

This privilege is in derogation of the common law and must be strictly construed. Miller, § 501.82.

This statute has never been construed in the context presented in this case. Indeed, a statute should be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute. *Fuller v. State*, 752 N.E.2d 235, 237 (Ind. Ct. App. 2001). In so doing, the objects and purposes of the statute in question must be considered as well as the effect and consequences of such interpretation. *Id.* at 237-38. When interpreting the words of a single section of a statute, we must construe them with due regard for all other sections of the act and with regard for the legislative intent to carry

out the spirit and purpose of the act. *Id.* at 238. We presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id.* Courts are not bound to adopt a construction that would lead to manifest absurdity in order that the strict letter of the statute may be adhered to. *Id.* They will rather look to the intention of the legislature, as gathered from the import of the whole act, and will carry out such intention as thus obtained. *Id.*

Our Shield Law was first enacted in 1941. *Jamerson v. Anderson Newspapers, Inc.*, 469 N.E.2d 1243, 1247 n.2 (Ind. Ct. App. 1984), *overruled on other grounds by Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990); *see also Hestand v. State*, 257 Ind. 191, 273 N.E.2d 282, 283 (1971) (listing legislative history of Indiana's shield-law statute up to that point, starting in 1941). Before the 1973 amendment and 1998 recodification that produced the statute in its present form, the privilege was "far more restrictive" regarding who was covered by the statute. Miller, § 501.582. That is, the privilege could be claimed only by those whose principal income was associated with news. *Id.* The privilege was available only to those associated with licensed broadcasting stations or newspapers published at least tri-weekly for five consecutive years in the same city or town with a paid circulation of at least two percent of the county in which it was published. *Id.*

Despite the Shield Law's lengthy existence in our state, there is very little Indiana case law on the statute. And what case law we have is not current. In one of these cases, *Jamerson*, a former police chief sued Anderson Newspapers, Inc. and a reporter from The Anderson Herald for a series of articles which the chief considered to be defamatory.

17

The chief later filed a motion to compel the newspaper and the reporter to reveal their unnamed sources. The defendants refused, asserting the Shield Law as a defense. A bench trial was held, and "judgment was entered that [the chief] take nothing in the action." *Jamerson*, 469 N.E.2d at 1245.

On appeal, we said that "our shield law . . . confers, without a doubt, an absolute privilege on the news media." *Id.* at 1246. As support, we cited the following language from the statute, "Any person . . . connected with a newspaper . . . *shall not be compelled* to disclose in any legal proceeding or elsewhere the source of any information procured or obtained in the course of his employment . . . ." *Id.* Therefore, while Indiana's privilege is indeed absolute, it is only absolute to the extent a source is involved. This was no doubt the case in *Jamerson*.

At the time of *Jamerson* in 1984, we noted that Indiana was one of eight states that had what was described as the "ultimate" in news media protections; that is, the press had "a seemingly unassailable privilege not to disclose the source of any information obtained in the course of employment." *Id.* at 1248 (footnote omitted); *see also Faucette*, 44 Val. U. L. Rev. at 198 n.68 (now listing Indiana as one of ten states with an absolute privilege).

Both parties agree that no Indiana appellate court has had the occasion to address the Shield Law in the context of an anonymous commenter[11] to an online news article. Appellant's Br. p. 11 n.5; Appellee's Br. p. 26. This, however, is about the only point the parties agree on.

---

[11] The word "commenter" "has emerged in popular press as the apparent favored alternative to 'poster,' which has other, more common meanings . . . ." Martin et al., 16 Comm. L. & Pol'y at 90 n.5.

While the parties' and our own research have revealed that other states have addressed their shield laws in the context of anonymous commenters to online news articles, these decisions are predominantly trial court orders, not appellate opinions. *See, e.g.,* Appellant's Br. p. 11 n.5 (citing trial court orders); Appellee's Br. p. 26-28 (citing trial court orders); *see also* Kirtley, 94 Minn. L. Rev. at 1494-99 (discussing trial court orders in several states).

Specifically, "in seven recent cases in state courts in which litigation parties or investigators have sought the identities of newspaper Web site commentators, news organizations and judges have turned to laws designed to protect journalists' confidential sources." Martin et al., 16 Comm'n L. & Pol'y at 91. And in six of those seven cases, the judges agreed that those identities met the shield laws' definitions of "information" protected by the laws. *Id.* at 111.

We now turn to the parties' arguments on our Shield Law. The crux of their arguments is who and what the Shield Law protects. At oral argument, The Star argued that the Shield Law protects any comment to an article on a newspaper's website, even if the comment was unrelated to the story and falsely accused someone of murder, because the Shield Law protects even defamatory speech. On the other hand, Miller argues that "The Star may not invoke the Shield Law because the reader who commented online is not a 'source' and this reader's identity was not 'procured' or 'obtained' by an individual in an editorial or reportorial role for The Star." Appellee's Br. p. 14. The parties focus on the individual language of the statute to make their respective arguments.

Initially, Miller argues that The Star has waived the Shield Law privilege because of its Privacy Notice. Miller also argues that by posting a comment on The Star's website, "DownWithTheColts" acknowledged and agreed that The Star could release information to "respond to claims that any content or materials submitted by you violate the rights of third parties." *Terms of Service*, The Indianapolis Star, http://www.indystar.com/section/terms (last updated Jan. 21, 2011). But these arguments by Miller overlook the fact that Indiana's privilege is personal to the newsperson and must be claimed by the newsperson, not the source. *Jamerson*, 469 N.E.2d at 1246; *Northside Sanitary Landfill, Inc. v. Bradley*, 462 N.E.2d 1321, 1325 (Ind. Ct. App. 1984); *see also* Miller, § 501.582. The Star's Privacy Policy merely warns users that their information *can* be released, not that it will be released. And here, The Star has clearly chosen to keep the identity of "DownWithTheColts" confidential. The Star did not waive its privilege.

Although the parties make several arguments on appeal,[12] this case boils down to whether "DownWithTheColts" is "the source of any information." *See* I.C. § 34-46-4-2 ("A person described in section 1 of this chapter shall not be compelled to disclose in any legal proceedings or elsewhere *the source of any information* procured or obtained in the course of the person's employment or representation of a newspaper . . . ." (emphasis added)).

---

[12] For example, Miller argues that: (1) Sweeney is not an editorial or reportorial employee; (2) there has been no showing that Sweeney received income from legitimate gathering, writing, editing, and interpretation of news; and (3) our Shield Law is inapplicable to current-day internet technology in which a reader comments on news articles. In light of our resolution of the source issue, we do not need to address these issues.

"Source" is not defined in the statute as it has been in other states' statutes. *See, e.g.*, Del. Code Ann. Tit. 10, § 4320 (West 1999) ("'Source' means a person from whom a reporter obtained information by means of written or spoken communication or the transfer of physical objects, but does not include a person from whom a reporter obtained information by means of personal observation unaccompanied by any other form of communication and does not include a person from whom another person who is not a reporter obtained information, even if the information was ultimately obtained by a reporter."); 735 Ill. Comp. Stat. Ann. 5/8-902 (West 2003) (defining source to mean "the person or means from or through which the news or information was obtained").

Source in the journalistic world is a term of art meaning a person, record, document, or event that gives information to a reporter in order to help write or decide to write a story. *See* The Wall Street Journal, *Terms in Journalism* (1997), http://info.wsj.com/college/glossary/journalism.pdf (defining "source" as "Person, record, document or event that provides the information for the story.").

Here, the anonymous commenter wrote his comments on the website only after The Star's article was published and not during the newsgathering process. Importantly, there is no evidence that The Star used this anonymous post in any way to further investigate and report on its initial story. The Star merely provided a place for "DownWithTheColts" to place his comment similar to if The Star had placed a bulletin board outside of its office building for anyone to tack an announcement. For this reason alone, we determine that the anonymous commenter was not a source as envisioned by our Shield Law. At least one trial court has found the same. *See* Martin et al., 16

21

Comm'n L. & Pol'y at 111 & n.130 (citing Illinois trial court order in *Alton Telegraph v. Illinois*, No. 08-MR-548 (Ill. Cir. Ct. May 15, 2009)).

Furthermore, looking to the statute as a whole, we believe that this outcome is consistent with our legislature's intent. The statute protects only the "the source of any information." The information from the source must be "procured or obtained in the course of the person's employment or representation of a newspaper." I.C. § 34-46-4-2. The person who obtains the information is not any person in the news bureau but rather must be "a bona fide owner, editorial or reportorial employee." *Id.* § 34-46-4-1. This language as a whole evinces a legislative intent to protect that information received by a person with editorial or reportorial functions who then uses those functions to evaluate in some way the information before deciding whether to disseminate it to the public.

Our legislature, like other legislatures, enacted our Shield law to ensure "public interest in the free flow of information *through* the press." 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5426 (1980) (emphasis added). To be sure, the free flow of information is vital, but that free flow is balanced by reasonable assurances that the information is reliable because it is sifted through and scrutinized by professional journalists. Indeed, "[p]rofessional integrity is the cornerstone of a journalist's credibility." Society of Professional Journalists, *Code of Ethics* (1996), available at http://www.spj.org/pdf/ethicscode.pdf. "[J]ournalists should be honest, fair and courageous in gathering, reporting and interpreting information." *Id.* When doing so, they must test the accuracy of the information from all sources and identify sources where feasible as the public is entitled to know as much information as

22

possible on sources' reliability. *Id.* No such evaluation of the information from "DownWithTheColts" was done here by any reporter, editor, or owner of The Star. As a result, there is no protection provided by our Shield Statute.

Edward Wasserman, the Knight Professor of Journalism Ethics at Washington and Lee University, believes that protecting anonymous commenters is a "bad idea." Kirtley, 94 Minn. L. Rev. at 1479. Wasserman posits that "anonymous posters are nothing like confidential sources":

> [N]ews organizations know who their confidential sources are, and what their agendas and biases may be. They vouch for the credibility of their sources to their readers and viewers, and by relying on them, put their own credibility on the line. By contrast, the identities of posters are "truly unknown," and "no one even tries to verify the information from the anonymous poster." "[C]laiming for anonymous posters the protections that confidential sources deserve debases the currency, mak[ing] a whistleblower no different from a crank. As an ethical matter, it's indefensible."

*Id.* at 1480 (footnotes and quotations omitted).

Giving anonymous commenters all-out protection is indeed a "bad idea." Extending an absolute privilege to anonymous commenters could actually work to undermine the privilege. *See* Kissinger & Larsen, 1068 PLI/Pat at 840-41. That is, the combination of shield-law protection for anonymous commenters and immunity under the CDA for website operators "could leave legitimately injured plaintiffs without a legal remedy." *Id.* As a result, some "fear that state legislatures might seek to narrow shield laws to rebalance the poster's and plaintiff's competing rights, with the consequence being encroachment on the protection presently enjoyed by the press for keeping its more traditional sources confidential." *Id.* at 840-41.

23

Strictly construing our Shield Law in a manner that looks to the language of the whole act and does not lead to manifest absurdity, we hold that to be considered "the source of any information," one must provide information that is then interpreted by the news organization. But as The Star conceded at oral argument, the record does not show that it used the comment by "DownWithTheColts" in any way. Given the facts in this case, "DownWithTheColts" was not the source of any information as contemplated by the Shield Law because the story was already published when the comment was made and there is no evidence that The Star utilized the anonymous comment in carrying out its newsgathering and reporting function.

## II. Anonymous Speech

The Star also contends that the First Amendment right to anonymous speech prevents it from having to turn over the identity of "DownWithTheColts." Miller, however, argues that the comments made were defamatory per se and therefore ineligible for constitutional protection. Analyzing this issue requires us to balance the right of Miller to seek redress for his grievance against the anonymous speech right of "DownWithTheColts."

### A. Federal Constitution

Anonymous speech has played an important role in the history of this country. "Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy or of dissent." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995). This First Amendment protection has been extended to material on the internet as well. *Reno v. Am. Civil Liberties Union*, 521 U.S.

24

844, 870 (1997) ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the internet]."). Unlike our Shield Law, this protection is a qualified privilege that requires the balancing of other rights against the right to anonymous speech, most commonly the right to seek redress for an injury.[13] *See, e.g.*, *McIntyre*, 514 U.S. at 353 (balancing right to anonymity and right to protection from fraud).

Although raised by neither party, when a third-party entity, such as a newspaper, is subpoenaed to reveal the identity of an anonymous commenter who has used that third party as a forum for his anonymous speech, the third-party has standing to contest the subpoena under the principle of jus tertii. *McVicker v. King*, 266 F.R.D. 92, 95 (W.D. Pa. 2010). This is so because "the relationship between [the newspaper] and readers posting in the [n]ewspaper's online forums is the type of relationship that allows [the newspaper] to assert the First Amendment rights of the anonymous commentators." *Enterline v. Pocono Med. Ctr.*, 751 F.Supp.2d 782, 786 (M.D. Pa. 2008). Further, courts have found that (1) anonymous commenters face practical problems contesting the subpoena themselves, as doing so would require them to reveal their identities; (2) newspapers involved in these types of cases have suffered an adequate injury-in-fact to meet Article III's case or controversy requirements; and (3) the newspaper will zealously argue the issues before the court. *See, e.g.*, *McVicker*, 266 F.R.D. at 96; *Enterline*, 751 F. Supp. 2d

---

[13] We also note that this case involves expressive speech and courts have given differing levels of protection to anonymous expressive speech depending on the nature of that speech. When the speech is commercial, for example, anonymous speakers are given less constitutional protection than those who engage in anonymous political speech, so courts will not impose the high bar of a summary judgment-based test when the identity of the anonymous speaker is sought. *See In re Anonymous Online Speakers*, 661 F.2d 1168, 1175 (9th Cir. 2011).

25

at 786.  As a result, The Star has standing to argue these First Amendment issues on behalf of "DownWithTheColts."

Although free speech is vigorously protected, a statement will not be afforded constitutional protection if it is defamatory.  *See* Ind. Const. art. 1, § 12 ("[a]ll courts shall be open; and every person, for injury done to him in his . . . reputation, shall have remedy by due course of law."). There are two types of defamatory speech in Indiana: defamation per se and defamation per quod.  *Baker v. Tremco*, 917 N.E.2d 650, 657 (Ind. 2009).  In order to maintain an action for defamation per se, a plaintiff must first assert that the statement is false.  *See* Ind. Const. art. 1, § 10.  The plaintiff must then demonstrate "(1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." *Baker*, 917 N.E.2d at 657.

A statement is defamatory per se if it imputes "(1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct."  *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). However, it is not enough that the statement carry with it one of those four defamatory imputations; rather, it must "constitute 'a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with.'" *Moore v. Univ. of Notre Dame*, 968 F. Supp. 1330, 1334 (N.D. Ind. 1997) (quoting *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258 (Ind. 1994), *reh'g denied*). The offensiveness of the statements cannot be determined by how the plaintiff views the statement; the defamatory nature must be present in the nature of the words without any additional facts or circumstances to give context.  *See id.*; *McQueen v. Fayette Cnty. Sch.*

26

*Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*; *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. 2000) (remarks that principal was a "liar" and "favored some staff" were not defamatory per se because they required reference to previous personal attacks against the principal to gain their defamatory meaning).

Whether the anonymous post by "DownWithTheColts" is defamatory per se, however, is a question of law for the court to decide. Miller argues that the statement is defamatory per se because it imputes criminal conduct and/or misconduct in his profession or occupation. He says that because the post refers to the former president of Junior Achievement, Appellee's Br. p. 17, and he was the president for fourteen years before the post, Appellee's App. p. 30, the post was directed at him. The Star, on the other hand, argues that Miller is not the only former president of Junior Achievement and the post does not even mention him by name. *See Lee v. Weston*, 402 N.E.2d 23, 29 (Ind. Ct. App. 1980) (holding that "defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff."). Based on the facts, however, it is reasonable to conclude that the post was made in reference to Miller, and that it imputed to Miller criminal conduct (theft) and misconduct in his occupation. The statement therefore was defamatory per se.

If the plaintiff can show that the statement was in fact defamatory per se, he still needs to demonstrate publication, damages, falsity, and malice in order to maintain a successful defamation action. *Kelley*, 865 N.E.2d at 597. Publication has clearly been established in this case. Additionally, damages may be presumed in an action for defamation per se "'as a natural and probable consequence' of the per se defamation."

27

*Id.* (quoting *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992), *reh'g denied*, *trans. denied*).  However, while Miller has alleged in his complaint that the statement made was false, he has yet to provide any proof of this assertion, which is necessary for his defamation claim to move forward.

In regards to malice, Indiana has adopted an "actual malice" standard in defamation for both private and public plaintiffs in matters of public concern.  *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999).  The culinary school project was a matter of public concern, so Miller must show by clear and convincing evidence that the defendant published the defamatory statement "'with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Id.* at 456 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  Since the comment at issue was anonymous, it will be impossible for Miller to make a showing of actual malice under Indiana law without the commenter's identity.

While we do not want defamatory commenters to hide behind the First Amendment protection of anonymous speech, we must balance the prospect of too readily revealing the identity of these anonymous commenters.  Different states have adopted a variety of standards in addressing this issue, and there has yet to be an opinion from the Supreme Court of the United States to settle this issue.

Despite the inconsistency, two relatively similar standards for revealing the identity of an online commenter have emerged as the most commonly used across the country.  *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 132 (D.D.C. 2009).  Those two standards are the *Dendrite* standard and the *Cahill* standard, and both require that the

28

plaintiff provide some proof of his defamation claim before the anonymous speaker is revealed. *See* Martin et al., 16 Comm. L. & Pol'y at 95.

The *Dendrite* test comes from the 2001 New Jersey case of *Dendrite International, Inc. v. Doe No. 3*, 775 A.2d 756 (N.J. Super. Ct. App. Div. 2001). In *Dendrite*, anonymous commenters made defamatory comments about the financial state of Dendrite International on a Yahoo! message board following the release of its Quarterly Report. *Id.* at 762. Dendrite sought an order to show cause why it should not be granted leave to conduct limited discovery to determine the true identities of the anonymous commenters. *Id.* at 763. The trial court allowed limited discovery to determine the identities of two of the four commenters. Dendrite appealed the order in regards to one of the commenters for whom discovery was denied. *Id.* at 764.

In making its decision, the court announced a four-part test that balanced the defendant's First Amendment rights with the plaintiff's reputation rights. In order to ascertain the identity of an anonymous online commenter, the plaintiff must: (1) notify the anonymous commenter via the website on which the comment was made that he is the subject of a subpoena or application for an order of disclosure and allow him time to oppose the application or subpoena; (2) identify the exact statements he believes to be defamatory; and (3) produce prima facie evidence to support every element of their cause of action before the disclosure of the commenter's identity. *Id.* at 760. If the plaintiff can satisfy all three of those factors, then the trial court must (4) "balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie

29

case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed." *Id.* at 760-61.

In addition to *Dendrite*, the other test that has been frequently adopted is the *Cahill* test. This test was articulated in a 2005 Delaware Supreme Court case and is a modification of the *Dendrite* test. *Doe v. Cahill*, 884 A.2d 451 (Del. 2005). In *Cahill*, a city council member sued four defendants who anonymously posted allegedly defamatory comments on a blog. *Id.* at 454. In an effort to serve process upon one of the commenters, Cahill sought an order from the trial court to require the owner of the IP address to reveal the commenter's identity, and the anonymous commenter immediately filed an emergency motion for a protective order. *Id.* at 455. The trial court applied a good-faith standard and granted Cahill's order. *Id.* (good-faith standard required Cahill to establish (1) that he had a legitimate, good-faith basis upon which to bring the claim; (2) the identifying information was directly and materially related to the claim; and (3) he could not obtain the information from any other source). The anonymous commenter appealed, claiming the standard used was not protective enough of his First Amendment right to free speech. Agreeing with the anonymous commenter and finding a need to better balance the protection of anonymous speech against defamatory speech, the Delaware Supreme Court reversed and adopted a modified version of the *Dendrite* test. *Id.* at 460-61.

In making its ruling, the Delaware Supreme Court found that the good faith standard was too lenient and could "chill potential commenters from exercising their First Amendment right to speak anonymously." *Id.* at 457. The court decided on the summary

judgment standard but distinguished its standard from the *Dendrite* standard. *Id.* at 460. Specifically, the court adopted a modified *Dendrite* standard consisting only of *Dendrite* requirements one and three: the plaintiff must make reasonable efforts to notify the defendant and must present enough evidence to withstand a summary judgment motion. *Id.* at 461. The court found the second and fourth *Dendrite* factors unnecessary: the second prong, setting forth the alleged defamatory statements, was part of the summary judgment inquiry of the third prong, and the fourth prong of balancing interests was also inherent in the summary judgment inquiry and added no additional protection. *Id*

After reviewing these tests, we find that the test that draws the most appropriate balance between protecting anonymous speech and preventing defamatory speech is the *Dendrite* test. This test contains the two elements that we find most important in deciding this issue: a summary judgment standard and a balancing of interests. The summary judgment standard is highly protective of speech and balancing the right of the injured party to seek redress against the anonymous speech rights ensures that no party's rights are unnecessarily infringed. Factors that the trial court should consider in balancing the parties' rights include "the type of speech involved, the speaker's expectation of privacy, the potential consequence of a discovery order to the speaker and others similarly situated, the need for the identity of the speaker to advance the requesting party's position, and the availability of other discovery methods."[14] *Mobilisa, Inc. v.*

---

[14] Miller alleges that Burk is "DownWithTheColts," but according to Miller, Burk denied any knowledge of the identity of "DownWithTheColts" in her Answer to his Second and Third Amended Complaints. Appellee's Br. p. 18. Miller therefore argues that The Star is the sole entity with this identifying information, a critical factor in an analysis under the test articulated in *In re Subpoena Duces Tecum to Stearns v. Zulka*. 489 N.E.2d 146, 151 (Ind. Ct. App. 1986). However, we note that *Zulka* is

31

*Doe*, 170 P.2d 712, 720 (Ariz. Ct. App. 2007). We also note that this is the test that the amici urge us to adopt. *See* Amicus Br. of Lee Enterprises p. 14; Amicus Br. of Public Citizen p. 19.

However, Indiana's defamation per se law presents a particular challenge because the plaintiff must prove actual malice. Such proof of actual malice would be impossible without identifying the commenter. Thus, a pure *Dendrite* test is not workable in Indiana. We therefore adopt *Dendrite* but modify it as was done in *Mobilisa* and require the plaintiff to produce prima facie evidence to support only those elements of their cause of action that are not dependent on the commenter's identity. 170 P.3d at 721. Therefore, prima facie evidence of actual malice is not required.

We remand this back to the trial court with instructions to apply the modified version of *Dendrite* to the facts of this case to determine if Miller has satisfied the requirements for obtaining the identity of "DownWithTheColts."

## B. Indiana Constitution

The Star further argues that the strong protection afforded to speech in Indiana requires reversal in this case because "the chilling effect of the disclosure of anonymous speakers' identities cannot be countenanced." Appellant's Br. p. 20. Miller, however, again argues that the comment posted by "DownWithTheColts" is defamatory per se, denying it constitutional protection and requiring the disclosure of the commenter's identity.

---

not applicable here, as it sets forth a test for determining whether information should be produced rather than whether the identity of a speaker should be produced.

32

We recognize that the Indiana Constitution "'more jealously protects freedom of speech guarantees than does the United States Constitution.'" *Mishler v. MAC Sys., Inc.*, 771 N.E.2d 92, 97 (Ind. Ct. App. 2002) (quoting *Lach v. Lake Cnty.*, 621 N.E.2d 357, 362 n.1 (Ind. Ct. App. 1993), *trans. denied*). The newsroom is a place where free speech has been particularly protected. In *In re WTHR-TV*, our Supreme Court stated "[w]here a media organization is subpoenaed, the Trial Rules require sensitivity to any possible impediments to press freedom. A showing that the information is unique and likely not available from another source should normally be required." 693 N.E.2d 1, 9 (Ind. 1998).

However, we adopt the modified *Dendrite* test as discussed above to determine whether Miller may obtain the identity of "DownWithTheColts" under the Indiana Constitution. While Indiana gives more protection to speech than does the federal constitution, this modified version of the *Dendrite* test has been called "likely the most speech protective standard in cases where defamation plaintiffs seek access to an anonymous online speaker's identity." Martin et al., 16 Comm. L. & Pol'y at 99. With neither party advocating a different test that would comport with Indiana's "jealous protection" of speech, we instruct the trial court to apply the same version of *Dendrite* as modified by *Mobilisa* to the facts of this case under the Indiana Constitution to determine if Miller has satisfied the requirements for obtaining the identity of "DownWithTheColts."

Reversed and remanded with instructions.

FRIEDLANDER, J., and DARDEN, J., concur.